Carl **COCHRAN; JoAnn H. Cochran, Plaintiffs,**

v.

**CELOTEX CORP.; Eagle Picher Industries; Keene Corporation; Raymark Industries, Inc.; Owens–Illinois; Owens–Corning Fiberglas Corporation; Crown Cork & Seal Company, Inc.; Pittsburgh–Corning Corporation; Armstrong World Industries, Inc.; Fibreboard Corporation; Garlock, Inc., Defendants.**

No. 87–3205.

United States District Court, C.D. Illinois, Springfield Division.

Dec. 14, 1988.

---

Lisa A. Blue, Baron & Budd, Dallas, Tex., Jack Nathan, Spector, Tappa, Kopp & Nathan, Rock Island, Ill., for plaintiffs.

Robert H. Shultz, Jr., Heyl, Royster, Voelker & Allen, Edwardsville, Ill., for Celotex Corp. and Keene Corp.

Fred B. Moore, Livingston, Barger, Brandt & Schroeder, Bloomington, Ill., Raymond H. Modesitt, Patrick, Wilkinson, Goeller & Modesitt, Terre Haute, Ind., for Raymark Industries, Inc.

Robert P. Harris, Harold A. Harris, Ltd., Chicago, Ill., for Crown Cork & Seal Co., Inc.

Michael J. Nester, Donovan, Rose, Nester & Szewczyk, Belleville, Ill., Martin J. Murphy, Cleveland, Ohio, for Eagle Picher Industries.

David B. Mueller, Cassidy & Mueller, Peoria, Ill., for Garlock Inc.

Robert H. Riley, Joseph J. O'Hara, Jr., Schiff, Hardin & Waite, Chicago, Ill., William S. Daniel, Belleville, Ill., for Fibreboard Corp., Owens–Illinois, Pittsburgh–Corning Corp.

Robert L. Martier, Lundblad & Baker, Chicago, Ill., for Owens–Corning Fiberglas Corp.

## OPINION

RICHARD MILLS, District Judge:

The procedural shenanigans of counsel in the case at bar are cause for extreme judicial concern.

This litigation is now completed in this Court, Plaintiffs having either settled with or taken a voluntary dismissal as to all Defendants. Before closing the case, however, one item of business remains, and that is who is to pay the costs created by the fast shuffle engaged in by counsel in this case.

Before addressing that question, the story of this action should be chronicled, and counsel for all parties may find that there is a surprise ending.

### I

Carl Cochran, according to his complaint, was injured by years of workplace exposure to asbestos-bearing materials. His wife, JoAnn, also claims injury through loss of Carl's consortium. Carl and JoAnn, like thousands of people nationwide suffering similarly, brought suit against various asbestos manufacturers and dealers for redress of their injuries. The Cochrans were somehow directed to the law firm of Baron & Budd of Houston, Texas, to represent their interests. This would seem a highly advantageous relationship for the Cochrans, because Baron & Budd—the Court understands—is one of the heavy hitters in the national asbestos plaintiff's bar.

Baron & Budd was off to a stellar start. The complaint filed by the firm named sixteen Defendants, each of whom was in some way tied to the Cochrans' injuries. Baron & Budd obviously knew who to sue. The firm knew how to plead an asbestos cause of action as well, since the case survived several motions for summary judgment. All seemed well from Plaintiffs' perspective; the suit was straight on course for a jury trial.

Defendants were likewise represented by prominent asbestos litigators who seemed to have the defensive strategy down pat. True, there were some slip-ups, such as the fact that most, though not all, Defendants forgot to plead statute of limitations as an affirmative defense until after their motions for summary judgment on that ground had been denied. But no matter—Plaintiffs' attorneys had not noticed that,

either. Anyway, Defendants generally went through their obviously well-practiced routine in bringing this case to fruition.

The cause proceeded nicely for such a seemingly complex matter. The Court can only ascribe the smoothness to the close relationships that the law firms had developed with each other in prosecuting these suits around the country. The Court was informed frequently that counsel for both sides dealt with each other regularly throughout the United States, and that consequently each side went out of its way to give the other any breaks that were called for in the slightest. So much the better for the Cochrans, perhaps—this camaraderie between their attorneys and defense counsel should have made the litigation experience much more bearable. So, too, does this perhaps explain why both sides overlooked obvious deficiencies in each others' pleadings.

At any rate, the parties got along famously and the case proceeded steadily toward an early October 1988 trial. Counsel of record for Plaintiffs was Ms. Lisa Blue; she counseled the Court regularly that settlement with all Defendants was imminent, and that the nearer the trial date came, the more favorable were settlement prospects. This was all well and good—this Court, like all others, encourages the parties to work problems out between themselves before invoking the solid hand of judicial authority. Nevertheless, this Court is in the business of providing that gloved, firm hand, and never shies away from judicial toil. Hence, though repeatedly assured that settlement would be perfected, this Court worked on the assumption that the case would be tried, and so prepared this arena for the combatants.

## II

The final pretrial conference was held on August 29, 1988. And this is where the plot thickens. Although both sides seemed to assume that settlement would be reached, both sides also rolled out their heavy artillery as well. As the early October trial date loomed nearer, both sides sent up barrage after barrage of motions.

Filed by Defendants on August 29—the very day of the final pretrial conference—were no fewer than 18 motions; Plaintiffs retaliated by launching a well-orchestrated defense of lengthy responses and informational briefs, and counter-attacked with a few motions of their own. It seemed as though Achilles and Hector had joined the fray, and that the battle between these worthy opponents would be epic.

But something about the means by which these warriors prepared for and did battle left nagging doubts with the Court about the veracity of the parties' war cries. Were these preparations in earnest, or was this merely a sham—smokescreens and light shows, collapsible swords and blank ammo? These doubts were created by a number of factors. One in particular comes to mind: one of Plaintiffs' responses to a motion in limine cited to Iowa evidence law, the relevancy of which in this diversity case brought in Illinois escapes the Court. Another pleading which raised doubts in the Court's mind was also filed by Plaintiffs—they responded to arguments never made in any motion filed by these Defendants in this Court!

Shortly before the trial date of October 4, the Court realized what was going on—instead of the pageantry of preparations for battle, the parties were engaging in the pomp and circumstance of ritualistic last-minute settlement posturing. The deluge of motions was not in earnest, but seemed to be only part of the pre-settlement formalities counsel for both sides had apparently worked out between themselves. That both sides filed precisely the same papers with each court around the country in which they appear is obvious—this explains the inclusion of points of Iowa evidence law. It is also obvious, though, that deviation from the routine upset the entrenched battle plan—this explains why Plaintiffs responded to arguments never made in this Court (Defendants had included the boiler-plate arguments in pleadings elsewhere; Plaintiffs made a knee-jerk response to the filings here without bothering to read them to discover if the arguments were the same or not).

This turn of events disturbed the Court—after all, even though to the parties this was routine and mechanical, the Court is constrained to give all pleadings objective and serious consideration, whether the parties really mean them or not. Still, that is the Court's business, and so we began wading through a sea of sloppy motions in anticipation of a trial no one expected to take place.

But, lo! A wrench fell into the smooth workings of this settlement machinery, and it suddenly appeared likely that the Cochrans would have a literal day (or more) in Court after all. Apparently a band of defendants—known as the Wellington group—had theretofore presented a unified defense to these asbestos suits. But this group came unglued and disbanded just prior to the trial of this case. One of these defendants, Celotex Corporation, appears to have switched defensive tactics, and now vows to take *all* asbestos cases to trial and to *never* settle. Additionally, Celotex decided to undergo a last-minute change of counsel.

The change in defensive tactics suited the Court just fine, of course. As always, our doors are open for the redress of injuries and the pursuit of justice. The Court had no objection to Celotex's intended change of counsel, either, even though we were not persuaded to grant a trial continuance based upon Celotex's decision to switch attorneys on the eve of trial. No, the Court anticipated a true Spartan battle; Celotex was even going to fly in a new litigator from California. Plaintiffs, too, got serious. Out of nowhere Mr. Fred Baron *personally* appeared, calling the Court and making his position known on many occasions in the two days prior to trial. Even though Ms. Blue was still listed as Plaintiffs' counsel of record, it was apparently determined to bring in a big gun, a named partner, to take over at the field command post. (It might be noted in passing that Mr. Baron never did present an official entry of appearance).

Indeed, Mr. Baron's handling of the pre-battle skirmishes was generally effective.

While he was unable to wrangle any concessions from the Court, he did manage to reach settlement agreements with all Defendants, except for that rascally Celotex, which stood firm in its new strategy.

Thus, literally upon the eve of trial, the stage seemed set for a genuine confrontation, despite Mr. Baron's heroic settlement attempts. Celotex was ready for trial—its man in California was prepared to board the "red eye special" and fly all night to do battle in our courtroom. The Court was ready for trial—even though a large number of pre-trial motions still awaited rulings, we were prepared to spend the time necessary to have everything ready for the jury the following day. Indeed, jurors had been notified to appear the following morning to hear the Cochrans' case and Celotex's defense. The Clerk's Office was doing yeoman's duty processing the pre-trial rulings entered by the Court, and the Court's support staff worked on the Cochrans' case to the exclusion of just about everything else.

Hence, it appeared that nearly everyone was ready for a trial. But Fred Baron, the Cochrans' attorney, did not think so. He was concerned about the hardship a jury trial would impose on Celotex, since it had only recently changed lawyers. And he was concerned about the well-being of Celotex's California lawyer, who would have to fly all night to try the case. And, Mr. Baron confided to the Court that he was concerned about his other cases across the country—he was concerned that Celotex would not cooperate in other asbestos cases as it had in the past if Celotex was forced to come to Illinois under these less than favorable circumstances (wholly caused, of course, by Celotex itself!).

Mr. Baron asked this Court for a continuance of trial; it was denied. Then Mr. Baron valiantly tried for a voluntary dismissal *without prejudice*. But this was out of the question. Backed into this awful corner, with the only alternative being to come to Springfield to try his clients' case, Mr. Baron swallowed the bitter pill—he

took a voluntary dismissal *with* prejudice![1]

## III

■ Had he abandoned the Cochrans? Of course, Mr. Baron would not so characterize the results of his machinations. He feels that he has adequately protected their interests against Celotex, because he apparently entered into a side agreement with Celotex by which Celotex agreed—in exchange for the voluntary dismissal *with* prejudice here—to not raise a res judicata defense elsewhere if in the future the Cochrans' cause of action is refiled. But the Court feels otherwise. Even though res judicata in most cases is an affirmative defense which can be waived, this duplicitious and ethically suspect maneuvering amounts to a fraud on the Court. This Court is confident that any other court, apprised of these circumstances, would dismiss the Cochrans' claim *sua sponte* as being no more than an attempt to find a court willing to put up with the parties' pre-trial games at taxpayer expense.

Many aspects of these antics disturb the Court, but perhaps most disturbing is the possibility that Mr. Baron's actions may have prejudiced the interests of his immediate clients in favor of the abstract interests of all his other clients. While the needs of the many must at times be considered, this should never be at the expense of the few.[2] But regardless of the motives underlying Mr. Baron's decision to voluntarily dismiss *with* prejudice, that action has an aroma about it that suggests a possible breach of ethical standards.[3] Although from the Court's vantage it would be impossible to identify any ethical improprieties here,[4] the prospect seems worth looking into, if only through introspection.

## IV

Lastly, it is time to reveal the surprise ending promised at the outset of this story. First, we will address the costs involved. It is apparent that counsel here (like counsel in so many other cases) have failed to realize the rippling of costs associated with our system of jurisprudence. At the center, of course, are the costs borne and paid by the parties (or just one, if fee shifting is available). Attorney fees and court costs are substantial, and create the biggest splash in the litigation pond. But these are by no means the only costs, as litigation attorneys all too often forget. The first set of concentric rings are comprised of costs borne by the public fisc. The judge, his law clerks, and his secretarial staff all earn public money for assuring plaintiffs their day in court; if a plaintiff is not really interested, changes his mind, or otherwise drops his case at the last minute, a great deal of court time has essentially been wasted. A waste of public funds follows the waste of judicial time. The court

---

1. As noted before, Mr. Baron was in frequent contact with the Court on the eve of trial, trying to finesse the Court into granting the concessions he sought. In contacting the Court for those purposes, though, Mr. Baron spoke with the Court's law clerk, as do all other counsel in similar circumstances. That is as it should be—the law clerk is the Court's eyes and ears, and in all respects acts for the Court. The law clerk is—quite literally—an "elbow clerk." When speaking to a Court's law clerk, counsel are speaking with the Court itself, and must therefore act accordingly.

2. Furthermore, the Court cannot comprehend the bind Mr. Baron felt he was in. He took all the steps possible to accommodate Celotex, including seeking a continuance and a dismissal without prejudice. These oral motions were denied, not because Mr. Baron was insincere in bringing them, but because Celotex had engineered its own difficulties. If Celotex was not appeased by these valiant efforts on its behalf by Mr. Baron, it is hard to see how Celotex could ever be satisfied in such a situation.

3. Several provisions of the American Bar Association's Model Code of Professional Responsibility may apply here, depending upon Mr. Baron's motives for taking the voluntary dismissal with prejudice. *See, e.g.,* DR6–101(A)(2) and (3) (requiring adequate preparation for, and forbidding neglect of, any legal matters taken on by an attorney), Canon 5 and its Disciplinary Rules and Ethical Considerations, and especially EC5–1 (requiring lawyers to provide each client undiluted fealty, and undistracted, fully independent attention), and Canon 7 and its attendant Disciplinary Rules (requiring zealous advocacy of all lawful objectives of a client through all reasonably available legal means).

4. Nor is it the Court's role to police the attorney-client relationships that come through our doors.

clerks and other court support personnel all work hard with each case that comes through the doors. Cases brought by parties not really wanting to be here clog up the works, and keep the entire judicial system from devoting more, and more *timely*, attention to those matters desiring and deserving attention.

The farthest ripple of all is perhaps the most important, but unfortunately is the least often considered in the scramble to avoid trial—this ripple is comprised of the jurors. Each plaintiff or defendant, in a proper case, is entitled to disrupt the lives of a good number of his fellow citizens. These jurors come willingly, often happily, some reluctantly, to serve the American system of justice. It does not often help that trial is called off at the last minute, because these citizens had already made plans to have children cared for, arranged for transportation (which in some districts of the United States courts is no small matter), and arranged time away from their own important work. The present case is on point—the final oral motion for a voluntary dismissal *with* prejudice and notice of settlement did not reach the Court until 5 p.m. the evening before trial, and the Clerk's Office was therefore busy until nearly 9 p.m. informing the jury venire that it did not need to assemble the following day after all.

The lack of concern about the many costs of running the judicial system is to a large extent understandable; counsel are to represent the interests of their clients zealously, using all legal means available, and the judicial system is the principal means at hand. But counsel must also remain at least somewhat sensitive to the larger costs of their actions on behalf of their clients, and to the extent possible reconcile the two. In the present case, the unconcern with any other or larger costs is flagrant—Baron & Budd not only does not care how its actions affected the Central District of Illinois, but apparently intends to visit this cause of action upon another court as well, thus duplicating its own efforts, Celotex's efforts, and court resources and time. Baron & Budd was presented with a ready, willing and (presumably) able forum in which to advance its clients' cause, but the firm walked away from that forum and all the costs these shenanigans caused.

■ Baron & Budd is thus taxed the costs involved. This amounts to $6.60 for donuts purchased for jurors which could not be returned, $17.26 for telephone calls to jurors informing them not to report the following morning, and $76.66, being the value of the Clerk's time, after normal working hours, calling prospective jurors. The Clerk's Office total is $100.52.

The Court realizes that this is a paltry sum that does not even approach the amount necessary for an appropriate sanction. But it is virtually impossible to quantify many of the real costs of the games played by Baron & Budd, and the Court cannot accurately calculate the proportionate costs of the judge and his staff for time wasted in ruling on the spate of unnecessary motions filed in the waning days of this case, and in going round and round with Plaintiffs over how they might get out of their firm trial date. (Bear in mind that these are taxpayers' dollars being wasted!) This picyune sum will therefore have to suffice, along with the admonishment to Baron & Budd that we would be greatly displeased—to phrase it gently—if these games are ever played in this Court again.

## V

■ We will now turn our attention to counsels' devious and underhanded method of ridding themselves of this Court—that is, the side agreement between the Cochrans and Celotex that the voluntary dismissal *with* prejudice shall not be raised in any other court in which this cause is brought. The Court has already made clear that it finds these machinations ethically suspect, as constituting a potential breach of the duty of candor or even an outright fraud upon the Court. That being said, the parties are hereby ordered to inform this Court in the event this cause is filed in any other court—federal or state—in this nation, within 11 days of the case having been so filed. This order is directed to all counsel for both the Cochrans and Celotex, and

in particular this order is directed to Mr. Fred Baron, of Baron & Budd, and counsel for Defendant Celotex Corporation, personally. This Court is to be so informed, even if counsel for either or both parties have changed, or even if the newly filed case names different parties or sports a different title. If the new case has already been filed, counsel are ordered to inform this Court within 11 days of issuance of this order.

It goes without saying, of course, that failure to abide by this order will subject all concerned to the appropriate displeasure and resulting sanctions of this Court.

## VI

*Ergo,* for the reasons above stated, the law firm Baron & Budd is hereby ORDERED to tender to the Clerk of this Court the sum of $100.52, this being the amount of costs created by the firm's actions before this Court.

Additionally, all counsel for all parties—and particularly counsel for Plaintiffs, counsel for Defendant Celotex Corporation, and Mr. Fred Baron—are hereby ORDERED to inform this Court in the event this cause of action, under whatever name and brought by whatever counsel, is filed in any court in the United States, and are to so inform this Court within 11 days of the filing.

Case CLOSED.