**Thomas E. MERRILL, Plaintiff,**

v.

**CHICAGO & ILLINOIS MIDLAND RAILWAY, Defendant.**

No. 88–3177.

United States District Court,
C.D. Illinois,
Springfield Division.

Aug. 15, 1990.

---

Kevin P. Durkin, Robert A. Clifford & Assoc., P.C., Chicago, Ill., for plaintiff.

Charles E. Holt, Hugh J. Graham, III, Graham & Graham, Springfield, Ill., Hugh C. Griffin, David R. Schmidt, Lord Bissell & Brook, Chicago, Ill., for defendant.

## OPINION

RICHARD MILLS, District Judge:

One thing this Court will not suffer lightly is trial by artifice and ambuscade.

We expect litigants and their counsel to abide by both the letter and the spirit of the Federal Rules of Civil Procedure, and to cooperate fully—within the metes and bounds of our adversarial system—in an effort to uncover the truth and attempt to do justice.

Yet during the course of this litigation we were forced to chastise defense trial counsel on several occasions to play by the rules—for instance, the defense waited until the morning one of its damage experts was to testify before it revealed some of that expert's intended testimony. Most egregious, though, was their last minute motion—literally on the eve of trial—to dismiss for *want of jurisdiction.*

We denied that motion when it was raised because the timing, nature and circumstances of the motion indicated that Defendant was not sincere, but intended the motion only to harass, delay and induce a favorable settlement. We here revisit that motion, though, this time raised as a motion for relief from the jury's $9,000,000 plus verdict against Defendant—a verdict which was well-substantiated by the evidence introduced during trial.

We *regretfully* must now grant Defendant that relief and allow it to proceed in another forum, for the reasons which we now discuss.

## SYNOPSIS

Plaintiff brought this case to our doorstep under the auspices of the Federal Employer's Liability Act (FELA) and the Federal Safety Appliance Act (FSA); he was severely injured during an attempt to rerail a derailed train car (among other things, he lost an arm and his spleen in the accident), and these two federal acts seemed clearly applicable. Defendant apparently agreed to the applicability of FELA and FSA, because it never did challenge our jurisdiction with regard to those acts. Instead, Defendant belatedly "discovered" that Plaintiff's avenue of recompense for his injuries derives solely from the Longshoremen and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950, to the exclusion of any other remedy, including those which might otherwise fall under FELA or FSA.

The factual context of Plaintiff's injuries is of supreme importance in choosing between the LHWCA on the one hand and the FELA and FSA on the other. The FELA and FSA are negligence statutes which provide a tort remedy for railroad workers injured on the job. The LHWCA, in contrast, covers "maritime employees" engaged in "indisputably longshoring operations," *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 273, 97 S.Ct. 2348, 2362, 53 L.Ed.2d 320 (1977), and provides a workers' compensation remedy administered by the Benefits Review Board of the Department of Labor; if liability exists under the LHWCA it is "exclusive and in place of all other liability of [the] employer to the employee." 33 U.S.C. § 905(a); *see also Nogueira v. New York, New Haven & Hartford R.R. Co.,* 281 U.S. 128, 50 S.Ct. 303, 74 L.Ed. 754 (1930) (the first in a long line of cases affirming the clear language of the "exclusive remedy" provision of the LHWCA).

Merrill was employed by the Defendant Railway and his injuries occurred during the course of that employment, and so FELA and FSA clearly apply. Merrill, however, worked at the Railway's Havana Coal Transfer Plant in Havana, Illinois, right on the Illinois River. The sole *raison d'être* of that plant is to transfer coal from rail cars onto barges for transportation on the river. The proximity of the Havana plant to the river, and the plant's purpose, raise the specter that some (or even many or all) of the Railway's workers at the plant are engaged in longshoring activities

(and particularly the loading and unloading of maritime vessels), and so their injuries are cognizable only in an LHWCA proceeding, and not in an FELA or FSA suit.

The specific issue raised by the Defendant's motion is thus whether the Plaintiff, Tom Merrill, was covered by the LHWCA when he was injured; if so, then no FELA or FSA recovery is possible. The issue itself is straightforward, calling for the application of easily provable facts to a large body of fairly consistent precedent.

## FACTS

The Defendant Railway operates rail lines in Central Illinois, and as part of its system it maintains a coal dumping station in the town of Havana on the Illinois River. This facility, known as the Havana Coal Transfer Plant, serves as intermediary between rail and barge transport of coal. The coal is shipped by rail to the plant; once there, the train is broken apart by the Railway's workers. Individual cars are then taken to the dumper where they are emptied, and the empty cars are then sent to the "empty track" where trains of empty cars are assembled for removal from the dumping facility.

The dumping process itself is fascinating. Once individual full cars are separated out for dumping, they are moved to an inclined portion of the track which leads to the dump house. The full car is then let loose to roll down the track and then into the dump house; the car's speed is controlled by "retarders" which are built into the tracks, and which are operated by a Railway employee who sits in a cab above the tracks. The retarders, when applied, provide a braking action against the car's wheels.

Once inside the dump house the full car is again controlled by retarders. These retarders, operated by the dump house operator, remain locked in until dumping is completed. The dumping process occurs after the car is stopped. The floor of the dump house (called the platen)—tracks and all—is literally tilted over until the coal in the car is dumped out. The platen returns to its original position then, and the retarders are released. The empty car sits there in the dump house until the next full car comes into the dump house for dumping; the full car hits the empty car, which helps stop the full car and sets the empty car rolling once more. The empty car rolls out of the dump house, down a hill, part way up another hill, and then gravity works to reverse its course and send it back down that second hill. At the bottom the empty car is automatically switched onto another track (the "empty track") on which it rolls into a large yard where the empty trains are assembled.

In the dump house, the coal is dumped onto conveyor belts. The dump house itself is over a hundred yards from the river; the conveyor belts transport the dumped coal to the river, where other railway employees load it into barges.

Tom Merrill was lead master mechanic at the Havana Coal Transfer Plant. On the morning of October 10, 1986, he was at work in the mechanics' shop when word came over the intercom that an empty car leaving the dump house had derailed, thus stopping all dumping operations. Presently Richard Fliege, Superintendent of the plant, came along and he and Merrill proceeded to the dump house to survey the damage. Once there, they determined that the derailment was too severe for Merrill and his mechanics crew to rerail, and so a special Chicago & Illinois Midland crew, known as the wrecking crew, was called in to rerail the car.[1] Meantime, Fliege ordered that the empty car be pushed with a front end loader until it was half in and half out of the dump house, in order to ease the rerailing process. Once this was done, the retarder within the dump house was applied to the car's rear wheels.

Within an hour or an hour and a half, the wrecking crew had assembled and set to work. They pulled their truck up close to the track on the hill outside the dump house—in fact, the truck was partly obstructing the track (in railroad parlance,

1. Testimony indicated that all derailments at the Havana plant were handled by the wrecking crew, except for derailments of only one axle in the empty track, which Merrill and his crew would take care of.

this is known as "fouling" the tracks). They then removed several hydraulic jacks from the truck, placed them under the derailed car, and hoisted the car up. Once in the air, the car was moved closer to the tracks, then let down—the crew referred to this as "throwing" the car. They then repeated the process, and the second time they successfully threw the car onto the tracks, rerailing it.

The hydraulic jacks used in throwing the car were operated by a wrecking crew member who worked down the tracks from the car. He worked a box connected by hoses to the jacks, and with this he was able to raise or lower the jacks as he was instructed by the others. For various reasons, including the length of the hoses and the necessity to see both sides of the derailed car, the box was set up in the middle of the tracks about 20 feet downhill from the car, and there the operator knelt and worked the jacks.

The morning was sunny, and the operator was facing into the sun, making it difficult for him to see the jacks. Tom Merrill had been instructed by Fliege to assist the wrecking crew as needed, and to this end Merrill stayed close to the hydraulic jack operator and shielded him from the sun with his body and later with his coat.

When the wrecking crew had first arrived, its foreman saw that the back wheels of the derailed car were stabilized by the dumping house retarders, and so he determined that it was unnecessary to also block the wheels with wooden wedges commonly used for that purpose.[2] Moreover, the hand brake on the front of the car was released—the wrecking crew members explained that rerailing was impossible with the hand brake set.

And so rerailing proceeded until, after the second throw, the car was once again on the tracks. During rerailing the dump house operator remained at his post, and at some point he was told by someone to release the retarder, which he did. As soon as the car was rerailed it began roll-ing down the hill, and understandably all the men standing nearby and working on the rerailing scattered for their own safety—all, that is, except for Tom Merrill, who was thinking of the hydraulic jack operator poised in the middle of the tracks just down the hill from the rolling car. Merrill reflexively moved toward the hand brake, determined to stop the car before it could crush the jack operator.

Before Merrill could reach the hand brake, however, the train collided with the wrecking crew's truck. Unfortunately, Merrill was between the truck and the car when they struck, and his arm was pinned between them.

Merrill did not lose consciousness, even though the pain was excruciating. He begged his co-workers for a knife with which to cut off his arm. One co-worker ran to get a bulldozer to pull the truck back, but in the meantime the Havana rescue squad and ambulance arrived and forbade moving the truck. Instead, Merrill's condition was stabilized and the rescue squad tried separating the rail car and the truck with airbags. When that proved unsuccessful—and after Merrill had been pinned for some 40 minutes—the rescue squad allowed the bulldozer driver to pull the truck away. (After the accident the wrecking crew had rather belatedly blocked the rail car's wheels).

As a result of the accident, Merrill lost his left arm, broke his right arm, and suffered a lacerated spleen which necessitated a spleenectomy. He experienced severe pain and suffering, and due to recurring pains (both real and phantom) he is likely to suffer further severe pain in the future. He is now unable to serve as a master mechanic for the Railway, and at the time of trial was employed as a clerk.

The jury heard all the evidence in the case and found the Railway liable under FELA. Further, the jury awarded to Merrill the following damages: $3,000,000 for disability; $1,000,000 for disfigurement; $275,000 for past pain and suffering;

---

**2.** The foreman also contended that blocking was impossible due to application of the retarders on the rear wheels, but everyone else who testified on the subject noted that a number of different wedge sizes were available, some of which would have fit on the tracks even with the retarders applied.

$3,000,000 for future pain and suffering; $920,000 as the present cash value of future medical treatment and care; $87,615 to recompense past earnings lost; and $760,000 as the present value of lost future earnings.

The total damages awarded were $9,042,-615, and this figure was well supported by the evidence introduced at trial, as was the jury's liability determination. Were we not now allowing this cause to proceed to LHWCA proceedings, we would gladly enter judgment on that jury verdict. Tom Merrill has been severely injured through the Railway's fault, and the jury's verdict would adequately compensate him for those injuries.

## THE LHWCA

The LHWCA is remedial legislation intended to provide a remedy to workers injured during longshoring activities. Traditionally such workers were not covered by admiralty remedies, and according to *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), they could not seek relief through state compensation systems, either, if they were injured seaward of the water's edge. *See P.C. Pfeiffer Co., Inc. v. Ford,* 444 U.S. 69, 72–73, 100 S.Ct. 328, 331–32, 62 L.Ed.2d 225 (1979). The LHWCA was thus enacted to cover workers injured or killed "upon the navigable waters of the United States (including any dry dock)." *Id.* Unfortunately, this rigid "situs" requirement created anomalous and inconsistent results, in that it allowed workers, during their normal work day, to walk in and out of LHWCA coverage as they moved to and from dry land. One case stands out: in *Nacirema Operating Co. v. Johnson,* 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969), and a related case, *Marine Stevedoring Corp. v. Oosting,* 238 F.Supp. 78 (E.D.Va.1965), *aff'd,* 398 F.2d 900 (4th Cir. 1968) (*en banc*), four workers were injured or killed when a crane knocked them from their workplace. One worker drowned, and because his body fell into the water he was covered by the LHWCA; conversely, the

other three fell onto a pier or were crushed against a railroad car, and the Court denied LHWCA relief to these men for failure to meet the statute's situs requirement. *See Pfeiffer Co.,* 444 U.S. at 73 n. 2, 100 S.Ct. at 332 n. 2.

In response to these cases, Congress in 1972 amended the LHWCA by broadening the situs requirement to allow recovery for injuries

occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

33 U.S.C. § 903(a). Additionally, the 1972 amendments added a "status" test—the only persons covered now are those "engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations...." 33 U.S.C. § 902(3).

That is not to say, however, that the 1972 amendments were in any way meant to reduce the number of covered workers; as the Supreme Court has admonished, "[t]he language of the 1972 Amendments is broad and suggests that we should take an expansive view of the extended coverage. Indeed, such a construction is appropriate for this remedial legislation. The Act 'must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results.'" *Northeast Marine Terminal Co., Inc. v. Caputo,* 432 U.S. 249, 268, 97 S.Ct. 2348, 2359, 53 L.Ed.2d 320 (1977) (quoting *Voris v. Eikel,* 346 U.S. 328, 333, 74 S.Ct. 88, 91, 98 L.Ed. 5 (1953)).[3]

For our purposes, four elements have been identified as relevant to a determination of LHWCA coverage under the 1972 amendments. *Chesapeake & Ohio Ry. Co. v. Schwalb,* —— U.S. ——, 110 S.Ct. 381, 384, 107 L.Ed.2d 278 (1989). Of course, the status and situs tests noted above must be

**3.** We pause to note that in this case precedent requires that we reach a harsh, if not incongruous, result by forcing us to ignore Plaintiff's well-founded jury award to allow proceedings to determine if coverage exists by the LHWCA workers' compensation system. We emphasize that we do not reach this result for any reason but adherence to precedent.

met; further, coverage is only available against an "employer," which is defined by the Act as

> an employer any of whose employees are employed in maritime employment in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

33 U.S.C. § 902(4).

Finally, for LHWCA coverage to exist, the worker must be injured "in the course of [his] employment...." 33 U.S.C. § 902(2).

Each of these elements is at issue here.

## THE MERITS

Merrill has vigorously argued that he is not covered by the LHWCA because none of the above four elements is met in his case. The Court, however, is constrained to find otherwise.

■ *(A) Course of Employment*—Merrill argues *not* that he was not acting in the course of his employment at the time of the accident, but rather that during trial the Railway took the position that he was not acting within the scope of his employment, and so it should now be estopped from switching course and arguing that he *was* acting in the course of his employment. As part of its FELA and FSA defense, the Railway claimed that Merrill was not where he was supposed to be and was *doing things he should not have been doing* when he was injured—that is, that he was not acting in the course of his employment. Merrill argued otherwise to the jury, though, and presented evidence that he was in the vicinity of the derailment principally because Fliege had instructed him to be there. Merrill now argues that the Railway should not be allowed to do this 180 degree reversal on this issue.

This argument is unavailing. First, factually the evidence clearly shows that Merrill *was* injured in the course of his employment, because as lead master mechanic part of his job was to attend to such incidents, and also because he was on the scene offering help on the express orders of his immediate supervisor. Indeed, the jury was given Plaintiff's instruction No. 19, which expressly said that at the time of the occurrence Plaintiff was acting in the course of his employment. Second, inconsistent positions are not forbidden in the federal system; Plaintiff has not presented any authority that switching views on this factual issue in the face of different legal theories is in any way improper or in any way should work an estoppel.

We therefore find that Merrill was "in the course of [his] employment" at the time he incurred his injury, within the meaning of the LHWCA.

■ *(B) Employer*—As above noted, for LHWCA liability to attach, the Railway must be an "employer," which in turn requires that it have "any ... employees [who] are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any ... adjoining area customarily used by an employer in loading [or] unloading ... a vessel)."

Merrill argues briefly and weakly that the Railway is not such an employer, but this argument too must fail. As explained below, Merrill himself is at least in part employed in "maritime employment" in an area customarily used by the Railway in the loading and unloading of barges. Moreover, the Havana Coal Transfer Plant employs many workers whose jobs are indisputably "maritime"—some, for instance, operate or pilot small boats in the river as part of the loading and unloading operation, while others work the conveyors that actually dump the coal into awaiting barges. In a slightly different context the Supreme Court has on several occasions observed that "the maritime employment requirement as applied to land-based work other than longshoring and other occupations named in § 902(3) is an occupational test focusing on loading and unloading." *Schwalb,* 110 S.Ct. at 385 (citing *Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 424, 105 S.Ct. 1421, 1427, 84 L.Ed.2d 406 (1985));

*see also Pfeiffer Co.*, 444 U.S. at 78–81. *See generally* Annotation, *"Maritime Employment" Coverage Under Longshoremen's and Harbor Workers' Compensation Act*, 41 A.L.R.Fed. 685 (1979).

Merrill also suggests that the true owner of the Havana Coal Transfer Plant is Commonwealth Edison, and so (presumably) the Railway itself does not conduct "longshoring" activities. The true ownership of the facilities, though, is utterly irrelevant. All that really matters is that the employer has at least one employee involved in maritime employment. *See Odom Construction Co. v. United States Department of Labor*, 622 F.2d 110 (5th Cir.1980), *cert. denied*, 450 U.S. 966, 101 S.Ct. 1482, 67 L.Ed.2d 614 (1981).

In the face of all this, Merrill's contention has no merit; the Railway is clearly an "employer" within the meaning of the Act.

█ *(C) Situs*—Merrill also argues that the "situs" requirement for LHWCA coverage was not met. Again, this element requires that the injury occur "upon the navigable waters of the United States (including any ... adjoining area customarily used by an employer in loading [or] unloading ... a vessel)." 33 U.S.C. § 903(a). Merrill argues that factually the dump house, and especially the tracks leading out of the dump house, do not meet this situs requirement.

Unfortunately, both the language of the Act and precedent belie Merrill's position. The Act requires (for our purposes) only that the situs be "customarily used by [the Railway] in loading ... a vessel," and the dump house certainly was so used. It is true that the tracks leading away from the dump house do not themselves directly assist in the loading process, but on the other hand, without them the loading process could not proceed—the tracks are "essential to the loading or unloading process," *Schwalb*, 110 S.Ct. at 385, and thus are within the situs.

The Railway relies on *Schwalb* as direct support for the conclusion that Merrill's injury occurred within the LHWCA situs; however, in *Schwalb* the situs requirement was not at issue (rather, only status was at

issue), and so the support that case offers is indirect only. Still, *Schwalb* is extremely similar to our case, and so does offer some support. In one of the two cases consolidated for appeal in *Schwalb*, an employee of Norfolk & Western Railway Co. was injured while repairing a retarder on one of the coal dumpers, presumably in the dump house; loading operations had ceased while he made the repairs. In finding coverage under the LHWCA, the Court noted that "[s]omeone who repairs or maintains a piece of loading equipment is just as vital to and an integral part of the loading process as the operator of the equipment.... Employees are surely covered when they are injured while performing a task integral to loading a ship." 110 S.Ct. at 385. The Court also noted that "[t]he determinative consideration is that the ship loading process could not continue unless the retarder ... was operating properly." *Id.* at 386. Of course, since *Schwalb* did not concern the situs requirement it does not answer the question of *where* the activities essential to loading ships must occur for coverage. But because § 903(a) (regarding situs) is tied directly to whether the location is "customarily used ... in loading ... a vessel," it seems clear that the same considerations driving *Schwalb* apply in the situs context as well. Looked at in that context, the dump house and the tracks where the derailment occurred here were integral to loading operations, and thus were covered by the LHWCA.

The fact that the dump house itself does not directly adjoin the river is of no moment, and that is so even though the dump house was some 100 yards or more from the river's edge. The test is functional—is the situs used as part of loading or unloading operations?—and here the test was met. *See also Garvey Grain Co. v. Director, Office of Workers' Compensation Programs*, 639 F.2d 366, 371 (7th Cir.1981) (holding that situs test was met where worker was inside mill portion of dockside grain facility); *Cargill, Inc. v. Powell*, 573 F.2d 561, 562–63 (9th Cir.1977) (finding situs requirement met where grain facility worker was injured while operating a "tip-

778

per" which, like the dump house here, was used to unload railroad cars); *I.T.O. Corporation of Baltimore v. Benefits Review Board,* 529 F.2d 1080, 1082–84 (4th Cir. 1975) (holding that several workers met situs test when they were injured in shipyard "marshaling" area 650 feet to three-quarters of a mile from water's edge). *See generally* Annotation, *Situs Requirement for Coverage Under Longshoremen's and Harbor Workers' Compensation Act as Amended,* 45 A.L.R.Fed. 247 (1979).

Merrill has asked rhetorically how far from the river he would have to have been before the LHWCA's situs test would no longer be met, and frankly we do not know. It is true, as Merrill suggests, that in a sense the entire Havana facility was an integral part of the loading and unloading process; for that matter, the train tracks leading from miles away could be said to be integral to loading the barges, because without those tracks the coal could not have reached the facility to be loaded. Obviously there is a line somewhere—perhaps within the Havana Coal Transfer Plant, and perhaps outside of that facility—where the situs test would no longer be met, and where no maritime jurisdiction would be present. *See Perkins v. Marine Terminals Corp.,* 673 F.2d 1097, 1101 (9th Cir. 1982) ("... there may be situations where injuries to maritime employees occur so far from navigable water that situs considerations alone would pose jurisdictional questions ..."). All we need now decide, however, is whether this particular situs was within the LHWCA's coverage, and it seems clear to this Court that it was.

■ *(D) Status*—The final element necessary to establish LHWCA coverage is the status requirement—at the time of his injury, Merrill must have been a "person engaged in maritime employment" to be subject to this workers' compensation system to the exclusion of his FELA claim. Merrill was employed by the Railway, considered himself a railroad man, and even belonged to a railroad union, and so it might seem curious that Congress would consider him a longshoreman or harbor worker for purposes of this Act. But plen-

ty of precedent exists finding that railroad workers working dockside can be covered by the LHWCA; *see, e.g., Chesapeake & Ohio Ry. Co. v. Schwalb,* —— U.S. ——, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989); *Price v. Norfolk & Western Ry. Co.,* 618 F.2d 1059 (4th Cir.1980); *Vogelsang v. Western Maryland Ry. Co.,* 670 F.2d 1347 (4th Cir.1982); *Harmon v. Baltimore & Ohio Railroad,* 741 F.2d 1398 (D.C.Cir. 1984); *Conligio v. Norfolk & Western Ry. Co.,* 670 F.Supp. 1353 (E.D.Mich.1987). Furthermore, Merrill's union membership is not overly relevant—"[w]e cannot assume that Congress intended to make union membership the decisive factor. The vagaries of union jurisdiction are unrelated to the purposes of the Act." *Northeast Marine Terminal Co., Inc. v. Caputo,* 432 U.S. 249, 268 n. 30, 97 S.Ct. 2348, 2359 n. 30, 53 L.Ed.2d 320 (1977).

Instead, the status requirement "is an occupational test focusing on loading and unloading," *Schwalb,* 110 S.Ct. at 385 (citing *Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 424, 105 S.Ct. 1421, 1427, 84 L.Ed.2d 406 (1985)), and railroad workers so engaged (i.e. loading or unloading ships) are within the LHWCA's reach as much as longshoremen are themselves.

The question, then, is whether Merrill was engaged in loading or unloading operations. The Railway claims that *Schwalb* is on all fours with Merrill's case, because there a railroad mechanic (like Merrill) was injured at the dump house (again like Merrill), and was held to be within the covered status. But this Court finds *Schwalb* to be inapposite in one crucial respect—the railroad mechanic there was "connected with the loading process only by way of the repair and maintenance services that [he was] performing when [he was] injured," 110 S.Ct. at 385; nevertheless, those services were "essential to the loading or unloading process" and his activities were "an integral part of and essential to those overall processes." *Id.* The Court concluded that "[e]mployees are surely covered when they are injured *while performing* a task integral to loading a ship." *Id.* (emphasis added).

In contrast, Merrill was merely helping to rerail a derailed train car at the time he was injured—his services at that time were not "an integral part of [or] essential to" loading or unloading the barges, except to the extent the derailment happened to halt loading operations that day. Compared to the breakdown of the actual loading equipment in *Schwalb*, the derailment's suspension of loading operations here was merely a fortuitous consequence of a railroad accident, as would have been a derailment of a loaded coal train prior to reaching the facility. The rerailment was not longshoring activity, it was railroad activity. *See Conti v. Norfolk & Western Ry. Co.*, 566 F.2d 890 (4th Cir.1977); *but see Harmon*, 741 F.2d at 1404 (rejecting *Conti* as merely suggesting "a simple distinction between 'traditional railroading tasks' and 'traditional maritime tasks' " which is too rigid after the 1972 amendments).

But there are two ways to meet the LHWCA status requirement—a worker can be injured *while performing* a function integral to loading or unloading operations (as in *Schwalb* ), or overall a worker's general job duties are integral to those operations, regardless of the task the worker was actually performing at the moment of injury. *See Atlantic Container Service, Inc. v. Coleman*, 904 F.2d 611 (11th Cir. 1990); *Boudloche v. Howard Trucking Co., Inc.*, 632 F.2d 1346 (5th Cir.1980), *cert. denied*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981); *Browning v. B.F. Diamond Construction Co.*, 676 F.2d 547 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983); *Thibodaux v. Atlantic Richfield Co.*, 580 F.2d 841 (5th Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979); *Hullinghorst Industries, Inc. v. Carroll*, 650 F.2d 750 (5th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982). Of course, we recognize that the Seventh Circuit has admonished that "[t]he 'moment of injury' test is no longer the test to determine the status of an employee under the Act," *Garvey Grain Co. v. Director, Office of Workers' Compensation Programs*, 639 F.2d 366, 371 (7th Cir. 1981), citing *Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 276, 97 S.Ct. 2348, 2363, 53 L.Ed.2d 320 (1977), to the effect that the LHWCA expresses Congress' "obvious desire to cover longshoremen whether or not their particular task at the moment of injury is clearly a 'longshoring operation.' " But neither *Garvey Grain* nor *Caputo* suggests that a worker's task at the moment of injury is *never* relevant. And indeed the consciously narrow holding of *Schwalb* lends credence to the view that the "moment of injury" can play an important role in the status determination, as the concurring justices in *Schwalb* recognized. *See also Herb's Welding*, 470 U.S. at 427 n. 13, 105 S.Ct. at 1429 n. 13 (recognizing that a *de minimis* amount of longshoring employment, in and of itself, cannot give rise to LHWCA coverage).

But anyway, the point is that, although we cannot find here that Merrill was engaged in "maritime operations" at the moment of his injury here, we do find that the primary focus of Merrill's job was to repair and maintain equipment integral to the loading and unloading operations, and since "the LHWCA covers employees who maintain and repair the equipment used in moving cargo between ships and land transportation," *Harmon*, 741 F.2d at 1403, the Act covers Merrill.

We reach this factual determination most reluctantly, but reach it we must, owing to the great weight of testimony supporting it. Not much testimony was elicited to support Merrill's position—the plant Superintendent, Fliege, stated that loading operations could continue without the lead master mechanic being present, and other witnesses testified that if the lead master mechanic was on vacation or sick he was not replaced, but still loading operations continued. And when major repair or overhaul work needed to be done on the dump house, the lead master mechanic and his staff were passed over in favor of a private consulting firm, Bollmeier Company.

The evidence supporting no LHWCA coverage takes a narrow view of the status requirement, almost to the point of focusing entirely on the moment of injury. In

this case, though, we must use a broader focus, and doing so reveals that Merrill's occupation at the facility was to repair and maintain the loading equipment, and in fact during dumping operations the entire mechanics staff remains on call in the event some mishap should occur to shut down loading, and they remain on call until dumping is completed. Indeed, Merrill himself testified that the essence of his job was to work on stationary equipment, including physical structures and the physical plant of the Havana Coal Transfer Plant; the lead master mechanic and his crew performed no repair duties on rail cars—instead, the Railway's "carmen" inspected and repaired those. When Merrill was asked, "[b]asically these various machines and mechanisms and equipment you work on is [sic] designed to transfer the coal to the barge; is that correct?", he affirmed that "[t]hat's what it's for." And Fliege testified that the dumping plant would eventually break down were it not maintained.

We therefore are constrained to find that Merrill was "engaged in 'maritime employment' by virtue of the work he did in performing his overall duties for his employer in repairing the loading [equipment] ... and general maintenance of the [coal] facility. These functions are an integral part of the loading and unloading of vessels and are directly connected with and are vital to the movement of maritime cargo on navigable waters." *Garvey Grain Co.*, 639 F.2d at 370 (citing *Caputo*, 432 U.S. at 271, 97 S.Ct. at 2361). *See also Sea–Land Services, Inc. v. Director, Office of Workers' Compensation Programs*, 685 F.2d 1121, 1123–24 (9th Cir.1982) (collecting cases).

### JURISDICTIONAL CONCLUSION

■ We have thus found that, for our purposes, the four LHWCA elements at issue in this case are met here, and that being the case, proper jurisdiction for this matter falls within the confines of 33 U.S.C. §§ 901–950. Once the case commences under that scheme, Merrill will be entitled first to informal proceedings, and then, if there is any doubt about coverage,

to a hearing before an administrative law judge. 33 U.S.C. § 919. Following an award or denial of compensation, review is available before the Benefits Review Board, § 921(b), and ultimately before the Seventh Circuit Court of Appeals. § 921(c).

Our order in this case does not purport to go any further than necessary. Hence, we do not intend our factual determinations to be binding in a LHWCA proceeding—no evidentiary hearing was ever held here specifically to determine the LHWCA coverage issue, but instead the facts recited above were tangentially related (at best) to the FELA and FSA action over which this Court presided. Moreover, a myriad of other issues, not raised or cognizable here, may effect LHWCA coverage. All these determinations are within the province of the LHWCA administrative scheme, and not of this Court; rather, our sole concern is jurisdictional, and the facts elicited indicate that of the two concurrent federal remedies available, the LHWCA remedy should be pursued prior to the entry of a FELA judgment, because if LHWCA coverage exists, our FELA jurisdiction is preempted.

Therefore, our finding that the four LHWCA elements at issue are met here is to be taken only in the narrowest possible sense—that is, as a contingent jurisdictional issue only—and not as any advisory opinion on the presence of LHWCA coverage. That can only be determined pursuant to the LHWCA administrative scheme. While all that is being sorted out, we will refrain from entering judgment on the jury verdict in this case. In the event the LHWCA proceedings result in no coverage, Merrill's judgment here will be intact and ready for entry. Conversely, if LHWCA coverage is found to exist, Defendant can at that time request anew that the jury verdict be set aside and the case be dismissed for want of jurisdiction. We therefore now deny the Railway's motions for relief from the jury's verdict and to dismiss for want of jurisdiction, with leave to renew those motions once LHWCA proceedings are concluded.

We similarly deny the remainder of the Defendant's post-trial motions (motion to alter or amend the judgment, motion for judgment notwithstanding the verdict, and motion for a new trial). These motions in part revisit motions previously ruled upon by this Court, and nothing in these new motions convinces us to change our rulings. These post-trial motions also argue that the jury's verdict was not supported by the law or the evidence, that the jury was inflamed in reaching the verdict, and a plethora of similar suggestions. We have earlier intimated, though, that we agree with the jury—the result would have been similar had the trial gone to bench rather than to the jury. The verdict is amply supported by competent and convincing evidence, and would justly compensate Merrill for injuries suffered due to the Railway's fault. These other post-trial motions are therefore denied.

## COUNSEL'S BEHAVIOR

We come at last to the most troubling aspect of this whole affair, and that is the behavior of the Railway's trial counsel in misusing this jurisdictional issue as a settlement expediter.

The Court has no quarrel with the fact that the Defendant raised the jurisdictional question. A jurisdictional issue with arguable merit should always be raised.

What *does* bother the Court is the manner in which the issue was raised. Defense trial counsel played fast and loose with our jurisdiction by using this issue as a sword of Damocles to hang over Plaintiff to induce a favorable settlement, and when that ploy was unavailing Defendant used its last-minute motion as a means of avoiding the FELA/FSA trial on the merits.

The LHWCA is no new compensation system; it has existed now, in one form or another, for well over 50 years. Nearly 20 years ago, in 1972, the Act was amended to broaden coverage sufficiently to raise the present issue as to Tom Merrill, and the Defendant Railway has been well aware of the Act since at least 1984, when it complied with the LHWCA's bonding requirements. Nevertheless, the Defendant apparently did not consider the possibility that the Act applied until (at the latest) December 27, 1989—two months after the Court's final pretrial conference—when defense counsel informed the Plaintiff of a new Supreme Court case, *Chesapeake & Ohio Railway Co. v. Schwalb,* —— U.S. ——, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989). Defense counsel provided the Plaintiff with a copy of the *Schwalb* opinion after a settlement discussion between the parties on that date, apparently hoping that the opinion would grease the skids of its most recent offer.[4] Plaintiff was therefore only made aware of this jurisdictional dispute a full year and a half after the date the complaint was filed (July 15, 1988).

Under the circumstances, Plaintiff likely viewed Defendant's actions as no more than strong arm settlement tactics, and understandably ignored them. Meantime, in mid-January of 1990, this Court notified the parties that trial would begin on February 7, 1990. Also in January the Railway made one or two more informal threats to Plaintiff regarding the LHWCA issue vis-a-vis settlement, and when Plaintiff stood his ground the Railway finally threatened to file a motion to dismiss on January 26, 1990. That date came and went with no such motion, however, and so the case proceeded apace toward its February 7 trial.

It is important to note that throughout this time period the Court had not been apprised by either party that a jurisdictional question loomed. To our knowledge, nothing stood in the way of a smooth FELA/FSA trial save the usual evidentiary

---

**4.** Defendant professes previous ignorance of the *Schwalb* holding despite the fact that *Schwalb* affirmed at least five federal courts of appeals' rulings while reversing the Supreme Court of Virginia, including an affirmance of the holding in *Garvey Grain Co. v. Director, Office of Workers' Compensation Programs,* 639 F.2d 366 (7th Cir.1981). *See Schwalb,* 110 S.Ct. at 384. In other words, *Schwalb* announced no new legal principles within the federal courts, and particularly within this circuit, and so Defendant could, and should, have been able to challenge our jurisdiction long before it did. Indeed, our own ruling in this case holds that *Schwalb* is inapposite here anyway, but that the LHWCA applies nonetheless due to previous precedent.

motions and such. In fact, the only remarkable pre-trial occurrence was that Defendant's lead trial attorney appeared unprepared at the final pre-trial conference held way back on September 25, 1989. He had not prepared any of the materials required by court rule! Parties are required to be ready for trial at the time and date of the final pre-trial conference, but Defendant was not. We ordered counsel to submit his pre-trial materials the next day, which he did.

Because of a large influx of criminal drug trials, we were not able to get the Merrill case to trial until early February. Hence, from late September until February—a full four months—this Court operated on the assumption that all was ready for the trial of this matter. No suggestion had ever been made that the LHWCA had any bearing on the case, and neither party had ever so much as alluded that the *Schwalb* decision had any applicability to these proceedings.

The Railway finally filed its motion to dismiss on February 1, 1990—just six days before trial. Of course, the Court was caught completely by surprise by the motion. Plaintiff was likewise caught unawares; since Defendant had only used the jurisdictional issue as a settlement tool, and had failed to follow through on its earlier threat to seek a dismissal, Plaintiff was likely lulled into assuming that Defendant had given up on its ploy and would drop the issue.

And so the upshot was that Plaintiff was unable to fully respond to the motion prior to trial; moreover, the Railway complained that to fully flesh out the motion an evidentiary hearing would be required. The Court, of course, was in no position to make an educated ruling on the motion, having been given scant time to consider it. Given the circumstances, we therefore assumed the Defendant did not raise the motion in earnest, but instead intended only to obfuscate the trial issues, throw Plaintiff off-balance, confuse the Court and delay the imminent trial; we accordingly denied the motion.

Indeed, what else could the Court have thought? Defendant knew the issue existed for well over a month (at the very least) before finally bringing it to the Court's attention. Defendant used the issue to toy with Plaintiff—teased and threatened Plaintiff with it—and then nonchalantly at the last minute tossed it into the well of the Court. Nor was it merely a motion dealing with the merits of Plaintiff's FELA/FSA claim—instead, the motion went to the very heart of this Court's judicial power. On top of all that, Defendant chose to spring its surprise on Plaintiff and the Court less than a week prior to trial, thereby guaranteeing that either (1) we would be forced to consider the motion based upon Defendant's well-crafted brief but giving Plaintiff far less than a week to put together a response, or (2) at the least Defendant would be granted a continuance and reprieve from the fast-approaching trial date.

Unlike Defendant, we do not consider questions of jurisdiction to be worthy of such cavalier (at best) or devious (at worst) treatment.[5] Defendant's ruse therefore backfired—we denied its motion and made it go to trial as scheduled, and there it lost in a big way—to the tune of $9 million. Following trial, Defendant raised its jurisdictional motion again. We and the Plaintiff had leisure this time to fully explore the issue, and as it turns out we must reluctantly hold that Defendant's motion has apparent validity.

The net result of Defendant's (and specifically defense counsel's) behavior is that ten trial days were utterly wasted. Those days could have been spent on other cases, which would have helped tremendously to relieve our caseload. The jurors' time was entirely wasted—these men and women were forced to take leave from their jobs

---

5. The Railway has explained that one reason for its tardy motion to dismiss was that it had recently gone through a management restructuring, and the new management team needed time to decide whether to seek LHWCA remedies or defend the FELA/FSA action. But our jurisdiction is not subject to managerial decisions and especially is business expediency no good excuse. As with pregnancy, jurisdiction is either there or it isn't, and there is simply no excuse for defense counsel withholding an issue of such fundamental importance.

and homes for no good reason beyond Defendant's whim, and their long and diligent struggle with this case was meaningless, thanks to Defendant's actions. The efforts of the witnesses, the parties, the attorneys, the Court and its support staff were equally squandered, and all for what? No acceptable answer exists. Moreover, Plaintiff is that much further from receiving the help he so desperately needs, compliments of Defendant's game playing.

We pondered briefly on the thought that Defendant, by its actions, could be said to have waived this issue or elected to forego the LHWCA route. But of course this is a jurisdictional question, and even in egregious circumstances—such as these—a court's jurisdiction cannot be conferred by agreement, nor can the lack thereof be waived. *Cf. Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 377 n. 21, 98 S.Ct. 2396, 2402 n. 21, 57 L.Ed.2d 274 (1977). We therefore simply have no power to enter judgment on the jury's verdict in this case, pending the administrative determination of LHWCA coverage.

That is not to say, though, that we are wholly lacking power in this matter. The parties are in our Court; we may not be able to tax Defendant with the jury's verdict, but we certainly can tax it (or, rather, Defendant's trial counsel) with all costs incurred as a result of its actions, including all jury costs, should it be determined that we had no jurisdiction. *Cf. Cochran v. Celotex Corp.,* 123 F.R.D. 307 (C.D.Ill. 1988). Other relief may be available to Plaintiff to compensate for needlessly having to try this case, *see, e.g.,* Fed.R.Civ.P. 11; 28 U.S.C. § 1927, but until the issue is presented we will not decide whether that relief is, in fact, available here.

*Ergo,* Defendant's motions for relief from judgment and to dismiss for lack of jurisdiction are DENIED with leave to renew upon completion of the LHWCA procedure. Defendant's other post-trial motions (to alter or amend judgment, for judgment notwithstanding the verdict, and for a new trial) are DENIED.

This Court will refrain from entering final judgment in this matter until completion of the LHWCA proceedings; meantime, the case is ADMINISTRATIVELY CLOSED.

Case CLOSED.