712 A.2d 1250

VASILIOS KAPSIS, PLAINTIFF–RESPONDENT/ CROSS–APPEL-LANT, v. PORT AUTHORITY OF NEW YORK AND NEW JER-SEY, AND PORT AUTHORITY TRANS–HUDSON CORPORA-TION, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS–APPELLANTS/ CROSS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 13, 1998—Decided June 30, 1998.

Before Judges BAIME, BROCHIN and WEFING.

*George P. Cook* argued the cause for appellants/cross-respondents (*Hugh H. Welsh*, Deputy General Counsel, attorney; *Mr. Welsh*, of counsel; *Mr. Cook*, on the brief).

*Paul B. Hirsch* argued the cause for respondent/cross-appellant (*Horn, Schechtman & Hirsch*, attorneys; *Michael J. Dillon* and *James Koblin*, on the brief).

The opinion of the court was delivered by

BROCHIN, J.A.D.

In this FELA[1] case, the jury found that defendant Port Authority Trans–Hudson Corporation (PATH)'s negligence and plaintiff Vasilios Kapsis' cigarette smoking were both proximate causes of his asbestosis and of his laryngeal cancer. The jury determined that Mr. Kapsis' total damages were $3,000,000 for pain and suffering and $732,000 for lost wages, and it apportioned seventy-five percent of the total negligence to PATH and twenty-five percent to Mr. Kapsis. On PATH's motion for a new trial or

---

[1] 45 *U.S.C.A.* §§ 51 to 60.

a remittitur, Mr. Kapsis was given the choice of accepting a reduction of his award for lost wages to $170,000 or having the amount of lost wages, but no other issue, redetermined at a new trial. He accepted the remittitur. After uncontested deductions for benefits under the Railroad Retirement Act, 45 *U.S.C.A.* §§ 231 to 231v, judgment was entered in his favor and against PATH for $2,377,500.

PATH has appealed and Mr. Kapsis has cross-appealed. PATH argues that the jury verdict is contrary to the weight of the evidence and that it is "mathematically wrong and excessive." Mr. Kapsis contends that the award should not have been reduced by apportionment because "no evidence was offered to establish a reasonable basis to apportion the plaintiff's lung disease between plaintiff's occupational exposures and his smoking."

Mr. Kapsis was sixty-one years of age at the time of trial. He worked for PATH as a trackman from 1969 to 1978 and as a machine repairman from 1978 to October 1993. While he was working as a trackman, he spent most of his time in the twelve or thirteen train tunnels that run between Newark, the World Trade Center, Jersey City, Hoboken, and Thirty-third Street in New York. As a machine repairman, he worked part of the time in an area referred to as the Hoboken Shop. He ate his lunches and took his coffee breaks either in the tunnels or in the Hoboken Shop.

Pipes, high voltage wires, and electrical connectors in the tunnels were protected by asbestos insulation. (In 1986 or 1987, some of the asbestos was removed by persons in white helmets and "space suits.") Trains and other machinery caused vibrations that would shake the asbestos materials, releasing asbestos fibers into the air. There were clouds of white dust in the tunnels. According to expert testimony, these clouds of dust probably indicated concentrations of asbestos in the air in quantities far greater than permitted by OSHA standards. In the Hoboken Shop, there was asbestos insulation wrapped around a heat transfer pipe and a hot water heater. A retired PATH employee who

had worked alongside Mr. Kapsis also testified that there were asbestos, diesel fuel and fumes, dust, and other substances in their work areas. PATH's current safety supervisor confirmed that there was steel dust and asbestos in the tunnels and asbestos at the Hoboken Shop.

In the course of Mr. Kapsis' work in the tunnels, he came into contact with the steel particles and asbestos fibers, with diesel fumes from machinery that was used for track repair, and with other potentially hazardous substances, including kerosene, diesel fuel, and weed killer. His cotton work gloves would absorb these materials. There would be thick dust on his hands and clothes and particles would regularly fall into his food and coffee. He would cough black dust and blood from his mouth and nose while he was working.

PATH did not warn Mr. Kapsis or his co-workers about the dangers of the materials they came into contact with and they were not trained how to protect themselves from the ill effects of these substances. There was no ventilation in the areas where Mr. Kapsis worked. He was not given any protective equipment except for a paper mask provided to him when he was working as a machine repairman in the 1980s.

Mr. Kapsis smoked one to two packs of cigarettes a day for thirty years. He also drank alcoholic beverages moderately.

In 1993, Mr. Kapsis consulted a doctor because his voice was becoming hoarse. A biopsy was taken. He was told that he had laryngeal cancer. An incision was made part way through his neck, through his throat and to the left side of his chest. His vocal chords and voice box were surgically removed. A tracheotomy was performed so that he could breathe through a hole in his throat. After his operation, an infection developed and he had to return to the hospital for two more weeks and for additional surgery. He underwent a program of radiation treatment seven days a week for seven weeks. His face and neck were burned in the course of the treatment.

As a result of the operation, Mr. Kapsis cannot speak except by use of a vibrator, an artificial voice box that generates sound. He feels that people are looking and laughing at him when he uses the voice box. At trial Mr. Kapsis' speech was inaudible to the jury and the trial judge noted that it was difficult for him to speak and difficult for others to understand him. An interpreter, who apparently stood or sat next to him, repeated his words to make them comprehensible to the jury. Because the operation to remove Mr. Kapsis' vocal chords has closed off his windpipe, he now breathes through the hole in his throat. He can no longer take showers because of the danger of getting water into that hole. He is short of breath when he climbs stairs or walks short distances, either from his tracheotomy or from pleural asbestosis, or a combination of both. His asbestosis has made him fearful that he will develop lung cancer. He has moved to Florida because he can no longer tolerate cold weather.

Dr. Susan M. Daum, who was accepted as an expert in internal medicine, occupational medicine, reading of x-rays, and epidemiology, testified that Mr. Kapsis suffered from laryngeal cancer, bladder cancer, and pleural asbestosis. She stated her professional opinion that his exposure to asbestos, steel particles, diesel or gasoline fumes, and other noxious substances while he was working for PATH was a proximate cause of his laryngeal cancer, and that his smoking and, to a minimal degree, his consumption of alcoholic beverages, probably contributed to causing that condition. She also testified that diesel exhaust fumes and, to a lesser degree, cigarette smoking probably caused Mr. Kapsis' bladder cancer, and that exposure to asbestos alone caused his pleural asbestosis. Dr. Daum, and PATH's experts also, testified that there was no way to apportion causation between Mr. Kapsis' smoking and his exposure to hazardous substances at work.

Dr. Michael Ellenbecker, an industrial hygienist, testified that the working conditions to which Mr. Kapsis was exposed indicated that PATH had not provided him with a reasonably safe place in which to work. According to Dr. Ellenbecker, PATH exposed Mr.

Kapsis to very hazardous materials which were known to be carcinogenic. Methods were available to reduce their hazard, but those methods were not utilized. Adequate respiratory equipment, ventilators, and protective gloves should have been provided. Dr. Ellenbecker stated that Mr. Kapsis should have been warned about the dangers of his work place, he should have been trained to minimize them, and a lunch room should have been made available so that the workers would not have to eat and drink at the job site.

Federal law provides the standard by which we must weigh PATH's argument that the verdict for Mr. Kapsis was contrary to the weight of the evidence. *Dice v. Akron, Canton & Youngstown R. Co.*, 342 *U.S.* 359, 361, 72 *S.Ct.* 312, 314, 96 *L. Ed.* 398, 403 (1952); *Ellis v. Union Pac. R. Co.*, 329 *U.S.* 649, 653, 67 *S.Ct.* 598, 600, 91 *L. Ed.* 572, 576 (1947); *Bailey v. Central Vermont Ry., Inc.*, 319 *U.S.* 350, 352, 63 *S.Ct.* 1062, 1063, 87 *L. Ed.* 1444, 1447 (1943); *Donovan v. Port Auth. Trans–Hudson Corp.*, 309 *N.J.Super.* 340, 348, 707 *A.2d* 171 (App.Div.1998); *Wicks v. Central R.R.*, 129 *N.J.Super.* 145, 147, 322 *A.2d* 488 (App.Div.), *certif. denied,* 66 *N.J.* 317, 331 *A.2d* 17 (1974). For purposes of the FELA, "[N]egligence ... attache[s] if [the employer] 'knew or by the exercise of due care should have known' that prevalent standards of conduct were inadequate to protect petitioner and similarly situated employees." *Urie v. Thompson,* 337 *U.S.* 163, 178, 69 *S.Ct.* 1018, 1028, 93 *L. Ed.* 1282, 1297 (1949). "[A] railroad has [a] nondelegable duty to provide its employees with a safe place to work...." *Shenker v. Baltimore & Ohio R.R.,* 374 *U.S.* 1, 7, 83 *S.Ct.* 1667, 1671–72, 10 *L. Ed.2d* 709, 714 (1963) (citations omitted); *see Foote v. Erie Lackawanna Ry. Co.,* 142 *N.J.Super.* 195, 202, 361 *A.2d* 62 (App.Div.1976). A jury verdict for the plaintiff should be sustained if "the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Missouri Pac. R.R.,* 352 *U.S.* 500, 506, 77 *S.Ct.* 443, 448, 1 *L. Ed.2d* 493, 499 (1957) (footnote omitted). In the

latter case, the Court declared, "It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence." *Ibid.* (footnote omitted). Consequently, "the quantum of evidence required to establish liability in an FELA case is much less than in an ordinary negligence case." *Harbin v. Burlington Northern Railroad Company,* 921 F.2d 129, 131 (7th Cir.1990) (citations omitted). Judged by these standards, it is clear to us that the evidence was more than sufficient to establish PATH's liability. *Cf. Foote, supra,* 142 *N.J.Super.* at 199–200, 204, 361 A.2d 62 (sufficient evidence for jury to conclude employer's negligence contributed to employee's injury where railroad had only one wrecking crew, railroad expected other employees to assist rerailment when wrecking crew was not available, and employee "felt something snap in his back" while assisting rerailment).

PATH's contention that it is entitled to a new trial because the damage award is "mathematically wrong and excessive" raises a closer question. The jury award of $732,000 for lost wages was clearly mistaken. Mr. Kapsis' W–2 forms showed gross wages, including substantial overtime, totaling $66,189 for 1991, $62,873 for 1992, and $84,189 for 1993. Because of his illness, he stopped working in October 1993. He testified that he had intended to work through 1999, when he would have been entitled to a full pension. The trial judge instructed the jury to consider only Mr. Kapsis' net wages, after income taxes, and to estimate the extent to which an award should be increased for inflation and reduced to present value to account for the interest that it will earn. There is no possible way that the jury could rationally have concluded from these facts and instructions that $732,000 was a proper amount to compensate Mr. Kapsis for his lost wages.

As previously mentioned, the trial court reduced the $732,000 for lost wages to $170,000. Neither party disputes that that figure is the amount to which Mr. Kapsis' lost wages should be reduced if the court acted within its discretion in granting a remittitur rather

than ordering a new trial on all issues or on all damage issues. PATH, however, contends that the excessiveness of the damage award shows that it is entitled to a new trial on all issues.

As support for its contention, PATH relies primarily on *Caldwell v. Haynes*, 136 *N.J.* 422, 643 *A.*2d 564 (1994). *Caldwell, supra,* was an action for damages for injuries resulting from an automobile accident. *Id.* at 426, 643 *A.*2d 564. The jury awarded the plaintiff a total of $1,950,000: $200,000 for past lost wages, $1.5 million for future lost wages, and $250,000 for pain and suffering. *Id.* at 429, 643 *A.*2d 564. The defendant moved for a new trial on both liability and damages. *Ibid.* The trial court found that the amounts awarded for past and future lost wages were grossly excessive and mathematically impossible. *Id.* at 429–30, 643 *A.*2d 564. The pain-and-suffering award also shocked its conscience. *Id.* at 430, 643 *A.*2d 564. Nonetheless, it affirmed the liability finding, but ordered a new trial on damages. *Id.* at 429, 643 *A.*2d 564.

Our court granted both parties leave to appeal. *Id.* at 430, 643 *A.*2d 564. We affirmed the trial court's denial of a new trial on liability because we were of the view that the evidence provided a reasonable basis for the jury's findings on that issue. *Ibid.* But we reinstated the jury's award of $1.5 million for future lost income and $250,000 for pain and suffering, and we limited a new trial solely to the issue of the amount of past lost income. *Id.* at 431, 643 *A.*2d 564. We also offered the plaintiff a remittitur, giving him the alternative of accepting a judgment for $1,750,000 and abandoning the $200,000 awarded for past lost wages. *Ibid.* The Supreme Court granted certification and remanded the case to the trial court, ordering a new trial on all damage issues unless the plaintiff consented to a remittitur. *Id.* at 443–44, 643 *A.*2d 564.

When the *Caldwell* case was before the Supreme Court, the defendant had abandoned its demand for a new trial on liability. But the Court found our use of remittitur appropriate and directed the trial court to consider remittitur on remand. *Caldwell,*

*supra,* 136 *N.J.* at 443, 643 *A.2d* 564. The Court said, "The practice of remittitur is encouraged at both trial and appellate levels in cases involving excessive damages.... However, the practice is available if the only issue is the quantum of damages, the claimant's right to relief is clear, and 'the verdict was not the result of compromise or otherwise tainted.'" *Ibid.* (citations omitted).

Our careful review of the entire record in the present case has convinced us that this case meets those tests. *Cf. Hanson v. Chicago, Rock Island & Pac. R.R.,* 345 *N.W.2d* 736, 738–40 (Minn.1984) (sustaining remittitur in FELA case with alternative of trial on damages only); *Strachan v. John F. Kennedy Mem'l Hosp.,* 109 *N.J.* 523, 538–39, 538 *A.2d* 346 (1988) (remand for retrial on damages only where trial judge erroneously instructed jury that case involved two separate negligence claims, rather than one); *Hudgins v. Serrano,* 186 *N.J.Super.* 465, 482–83, 453 *A.2d* 218 (App.Div.1982) (sustaining offer of remittitur where damages were excessive and liability was affirmed); *Eschberger v. Consolidated Rail Corp.,* 174 *A.D.2d* 983, 572 *N.Y.S.2d* 539, 540–41 (App.Div.), *appeal denied,* 79 *N.Y.2d* 752, 580 *N.Y.S.2d* 198, 588 *N.E.2d* 96 (1991), *cert. denied,* 503 *U.S.* 1011, 112 *S.Ct.* 1778, 118 *L. Ed.2d* 435 (1992) (granting new trial on all damage issues in FELA case unless plaintiff accepted reduction of pain-and-suffering element of award which also included award for medical expenses and lost wages). Consequently, the trial court was correct in offering remittitur. But we must decide whether the reduction of the $732,000 award for lost future wages to $170,000 was sufficient or whether the $3,000,000 award for pain and suffering was either tainted or so shockingly excessive that it, too, must be reduced or a new trial ordered.

▪ Federal law directs us to test the excessiveness of the verdict by comparing it with awards in other FELA cases. *See Brown v. Louisiana & Arkansas Ry. Co.,* 429 *F.2d* 1265, 1267 (5th Cir.1970) (citing *Grunenthal v. Long Island R.R.,* 393 *U.S.* 156, 159, 89 *S.Ct.* 331, 333, 21 *L. Ed.2d* 309, 313 (1968)). In *DeBiasio v.*

*Illinois Central Railroad,* 52 *F.*3d 678, 682, 687, 689 (7th Cir.1995), the court sustained a FELA verdict for $4,201,000, of which $1,150,000 was for future lost earnings, for a railroad workman whose left arm was caught under the wheels of a train and amputated at the shoulder. The court summarized cases sustaining comparable awards as follows:

> In *Frazier [v. Norfolk & W. Ry. Co.,* 996 *F.*2d 922 (7th Cir.1993) ], this court upheld a $2.3 million award for a back injury for an individual who did not require continued medical treatment or prescription pain medication, and could lift objects weighing under fifty pounds. *Id.,* 996 *F.*2d at 926; *see Lewis v. Illinois Cent. R.R. Co.,* 234 *Ill.App.*3d 669, 175 *Ill.Dec.* 573, 575, 600 *N.E.*2d 504, 506 (1992)[, *appeal denied,* 148 *Ill.*2d 643, 183 *Ill.Dec.* 21, 610 *N.E.*2d 1265 (1993) ] ($3,935,700 award for back injury). In *Schneider [v. National R.R. Passenger Corp.,* 987 *F.*2d 132, 137–38 (2d Cir.1993) ], a FELA jury verdict of $1.75 million was upheld "where the only physical injuries were multiple contusions, laceration of the tendon in the left thumb and laceration of the nerve in the left thumb." *Frazier,* 996 *F.*2d at 926. In *Smith v. National R.R. Passenger Corp.,* 856 *F.*2d 467, 472 (2d Cir.1988), the jury awarded $3.5 million to a railroad employee whose kneecap was shattered. Finally, in *Merrill v. Chicago & Illinois Midland Ry.,* 751 *F.Supp.* 770 (C.D.Ill.1990), after a FELA and FSAA trial, a jury awarded over $9 million to a mechanic at a coal transfer plant whose left arm was amputated during an attempt to rerail a derailed car. Although the case was ultimately dismissed, the jury verdict itself was not found to be excessive by the trial judge. *Id.* at 775 ("Were we not now allowing this cause to proceed to [Longshoreman and Harbor Workers' Compensation Act] proceedings, we would gladly enter judgment on that jury verdict.").

*[Id.* at 688–89.]

The trial judge in the present case rejected PATH's contention that the $3,000,000 award to Mr. Kapsis for pain and suffering was excessive. He said:

> In so far as awarding $3,000,000 to plaintiff, under the circumstances of this case I find that it was not such that it would be manifestly unjust. The plaintiff has a life expectancy of 19 plus years at the present time. He has all but lost the use of his voice, the power to communicate. While he is able to express himself by the use of a device, it is very difficult to understand him. That was exhibited during the course of the trial.... [I]t has impacted upon his way of life, his ability to socialize, his ability to enjoy recreational activities that he previously enjoyed. He spent five weeks in the hospital, received radiation treatment. It had a significant impact on him. Although the verdict is generous I can't find that is so excessive to be manifestly unjust.

In the light of the trial court's findings and the decisions in other FELA cases, we conclude that the jury's $3,000,000 pain-and-

suffering award is not so high that it shocks our judicial conscience.

However, PATH argues that a new trial of all damage issues is required because the award for future lost wages cannot be separated from the award for pain and suffering. It points to the following language from *Caldwell, supra,* as support for that proposition:

> We cannot conclude in the context of all of the evidence relating to damages that the excessive lost wages awards are "fairly separable" from the pain-and-suffering award. Although the trial errors related only to past and future lost income, the excessiveness of those awards and the "interrelationship of the various items of plaintiffs' claim undermine[ ] the continued reliability of the separate awards," including that of pain and suffering.
>
> [136 *N.J.* at 443, 643 *A.*2d 564 (citations omitted).]

The import of that language for the *Caldwell* case was that even though the award for pain and suffering was not excessive, that element of damages would have to be retried along with the other damage issues *if there was a retrial.* The Court noted that "the Appellate Division appropriately has made remittitur available," but directed that "the remittitur on remand should offer the choice of a reduction of damages *or* a new trial on *all* damages" rather than only on the elements of damages which were excessive. *Caldwell, supra,* 136 *N.J.* at 443, 643 *A.*2d 564 (citation omitted). The implication of this direction for the case before us is that the trial judge should have given Mr. Kapsis the choice of either accepting the reduction of $562,000 in his award or having all damage issues retried. However, since Mr. Kapsis accepted the remittitur and therefore no damage issues need to be retried, the error is harmless.

■ We turn now to Mr. Kapsis' cross-appeal which challenges the submission of the comparative negligence issue to the jury. The pertinent language of the FELA reads as follows:

> In all actions ... brought against any such common carrier by railroad ... to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, *but the damages shall be*

*diminished by the jury in proportion to the amount of negligence attributable to such employee . . . .*

[45 *U.S.C.A.* § 53 (emphasis added).]

In the present case, PATH contended that Mr. Kapsis was negligent by continuing to smoke cigarettes after having read the warning labels on the packages and that that negligence contributed to his condition. Mr. Kapsis does not contend that cigarette smoking could not constitute contributory negligence. *See Zarow–Smith v. New Jersey Transit Rail Operations, Inc.,* 953 *F.Supp.* 581, 585–86 (D.N.J.1997) (whether plaintiff's smoking was contributory negligence was for jury where evidence was presented that smoking was a cause of plaintiff's lung cancer); *see also Paul v. Missouri Pac. R.R.,* 963 *F.*2d 1058, 1061 (8th Cir.), *cert. denied,* 506 *U.S.* 999, 113 *S.Ct.* 599, 121 *L. Ed.*2d 536 (1992) (when railroad employee claimed occupation caused hearing loss, employer could prove employee's recreational shooting without ear protection was contributory negligence). He argues, however, that the cause of his laryngeal cancer, which is the condition to which his cigarette smoking probably contributed, is indivisible and, although the parties' experts differed with respect to the relative significance each attributed to the cigarettes, both agreed that it was impossible to determine how much of a role was played by his smoking and how much by the hazards of his working environment.

There was expert testimony about the relative significance of cigarette smoking and of exposure to asbestos in causing laryngeal cancer. However, this data describes the relative frequency of particular cancers in a population. We agree that it appears impossible to determine what the relative contribution of each of these agents was to causing Mr. Kapsis or any other individual to contract cancer.

However, the difficulty of determining just what contribution the negligence of each of the parties contributed to a plaintiff's injury is not unique to this case. For example, there is no way to mathematically compare a railroad employer's negligence in providing faulty brakes with the injured employee's negligence in

exceeding established speed limits. In a sense, almost any two concurrent acts of negligence are incommensurable.

The Act does not ask the jury to weigh or measure in a literal sense. It requires the jury to judge the relative culpability of each party's acts which are proximate causes of the plaintiff's injuries. That kind of qualitative judgment is illustrated by *New York, C. & St. L.R. Co. v. Niebel*, 214 *F.* 952 (6th Cir.1914), an early case decided under the FELA. In that case, Niebel's administratrix sued for damages for his death which had resulted when the caboose in which he was riding was rammed by a following train. *Id.* at 954. The negligence charged to the railroad was the excessive speed of the engineer in charge of the train which struck the caboose. *Ibid.* The railroad alleged Niebel was contributorily negligent because he had not performed his duty as the flagman who, when his train was stopped, was supposed to go immediately a designated distance to its rear with a signal to alert oncoming trains. *Ibid.* On appeal, there was a dispute about the admissibility of evidence of a railroad rule that the engineer was obligated to blow a whistle to signal the flagman to go to the rear of the train. *Id.* at 956. The Circuit Court held that the rule was relevant because evidence that the engineer had failed to blow the whistle would mitigate Niebel's contributory negligence in failing to take his post at the rear of the train. *Id.* at 956–57. The court offered this analogy as explanation for its ruling:

[S]uppose that Niebel had not been killed and that the officers of the road were considering what punishment should be inflicted for his violation of [the] rules.... Doubtless, they would not entirely excuse him because his engineer had not signaled under rule C–14; but we cannot say that they would not take into consideration Niebel's claim that he supposed (though wrongfully) he would get a signal from his engineer, if it was necessary to send a flag back. If this excuse could be considered by the road officials in determining the ultimate character of his fault, we think it may also be considered by the jury.

[*Id.* at 957.]

*See Sears v. Southern Pac. Co.*, 313 *F.*2d 498, 502–03, 503 n. 4 (9th Cir.1963) (the jury evaluates and compares the "gravity of the fault" and the "blameworthiness of the tortfeasor"); *Holweger v. Great N. Ry. Co.*, 269 *Minn.* 83, 130 *N.W.*2d 354, 361 (1964) (the

extent of defendant's knowledge of unsafe conditions was relevant with respect to both the quantity and quality of its negligence in permitting the conditions to exist); *see also Dafler v. Raymark Indus., Inc.*, 259 *N.J.Super.* 17, 35, 611 *A.2d* 136 (App.Div.1992), *aff'd o.b.*, 132 *N.J.* 96, 622 *A.2d* 1305 (1993).

The jurors heard testimony which enabled them to evaluate PATH's responsibility for failing to provide Mr. Kapsis with a safe place to work. They learned from Mr. Kapsis' testimony that he had smoked between one and two packs of cigarettes a day for the past thirty years and had continued smoking after cigarette packs bore warning labels. The expert witnesses presented their conflicting theories about the relative significance of exposure to asbestos and of cigarette smoking as causes of laryngeal cancer. These facts were sufficient to enable the jury to evaluate the blameworthiness of each party. Their apportionment of seventy-five percent of the blame to PATH and twenty-five percent to Mr. Kapsis was not irrational.

The judgment appealed from is therefore affirmed.