Steve DeBIASIO, Plaintiff–Appellee,

v.

ILLINOIS CENTRAL RAILROAD,
Defendant–Appellant.

No. 94–3000.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1995.

Decided April 13, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied July 17, 1995.*

---

* Walter J. Cummings, Circuit Judge, did not participate in the consideration of the petition for rehearing.

Jerome H. Torshen, Steven P. Garmisa (argued), Torshen, Spreyer & Garmisa, Brian C. Walker, James L. Farina, J. Dillon Hoey, Hoey & Farina, Chicago, IL, for plaintiff-appellee.

Francis D. Morrissey, Michael A. Pollard (argued), Gary W. Fresen, Thomas W. Cushing, Baker & McKenzie, Thomas F. Tobin, Connelly & Schroeder, Chicago, IL, for defendant-appellant.

Before ESCHBACH, COFFEY, and RIPPLE, Circuit Judges.

ESCHBACH, Circuit Judge.

Steve DeBiasio was seriously injured while in the employment of the Illinois Central Railroad ("IC"). DeBiasio brought this action against IC alleging violations of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60, and the Federal Safety Appliance Act ("FSAA"), 45 U.S.C. §§ 1–43. The jury found IC liable under both Acts and awarded DeBiasio $4,201,000 in damages. IC appeals the finding of liability and the award of damages. As to the issue of liability, IC challenges the sufficiency of the evidence and certain evidentiary rulings of the trial court. We have concluded that the evidence was sufficient and, while the trial court erred in a significant evidentiary ruling, such error was harmless. We affirm.

## I.

Railroads connect individual freight cars together through a coupling mechanism located at either end of each car. The coupling mechanism consists of a drawbar and a knuckle that connects with an adjacent car. A pin inside the coupler knuckle locks the knuckle in a closed position. Using a "pin lifter" or uncoupling lever, the pin can be removed and the knuckle can be opened without having to step between the rails. As long as the couplers on both cars are set properly so that the drawbar, which rests on a pivot to allow the car to round curves without derailing, is aligned and at least one of the knuckles is open, two cars will connect automatically upon impact.

In a classification or switching yard, the railroad is able to separate freight cars which are currently coupled together and reassemble them with other cars having common destinations. The yard normally consists of "lead" tracks, where inbound trains come in and wait to be switched, and a number of individual tracks where the reassembled cars are placed. During a "flat switching" operation, an engineer begins to back up a set of cars toward a designated track. The switch list indicates in what order cars are going to be switched into each track. A switchman then uncouples a group or "cut" of cars by pulling the pin lifter attached to the front coupling mechanism on the following car. When the pin is lifted, the engine stops and its momentum sends the now unattached cars into the bowl-shaped area of the yard. The descending cars are directed into the appropriate track according to the switch list where they are automatically coupled upon impact with the cars presently sitting in that track.

In the early hours of the morning on February 6, 1992, DeBiasio was performing his duties as a switchman for IC at its Glenn Yard in Chicago. DeBiasio was then 33 years old and had worked for IC for 13 years. His crew included John Smith, the engineer operating the switching engine, Tony Manestar, the conductor in charge of the crew, and, Johnny Wilson, the utility switchman who at the time was lifting the pins to release cars to one of the Yard's twenty tracks. DeBiasio was the field switchman responsible for opening and closing the switches so that the cars would roll into the proper tracks, and checking to see if the cars coupled on impact with the cars already standing on those tracks.

DeBiasio's shift had started at 10:30 pm. After the crew ate "lunch" at around 2:00 in the morning, Manestar distributed the switch list for the rest of the shift's operations. Smith lined a cut of 22 cars onto the switching lead for tracks 1–10. In the second movement of cars after lunch, three cars were sent, or "kicked," onto track 8. Wilson testified that he was able to pull the pin on the coupler connecting the last car to remain with the train with the three cars to be released, and the momentum of the three

cars' release opened up the knuckle on IC car 388423 which remained and became the lead car for the next cut of cars. Thus, on the subsequent movement, when six cars were released for track 3, the lead car's coupler was in the open position, ready for coupling. After DeBiasio flipped the switch for track 3 in preparation for this movement, he informed Manestar by radio that there was insufficient room in track 3 for the scheduled six cars. When this happens, a cut of cars may "foul" the lead track, so that the cars do not go completely onto the designated track and thus block the lead track. DeBiasio thus returned to track 3 to check on the progress of the six cars which had already been released. As DeBiasio was walking along the lead to track 3, he heard the 6 cars make contact with the cars already on that track. Listening to his radio, DeBiasio heard that the fourth movement of cars had also taken place and they were now planning on sending 2 additional cars to track 3. When he heard the impact of these two cars on the six other cars presently on track 3, he assumed that track 3 was no longer a "live" track and the other switch movements would not affect his ability to inspect the six cars on track 3.

DeBiasio discovered that there was a gap of 20–25 feet between car 388423 and the standing cars on track 3. He noticed that the knuckle on car 388423's coupling mechanism was now closed when it previously had been open. Thus, he believed the cars had failed to couple automatically upon impact. DeBiasio then proceeded to attempt to open the knuckle on car 388423 with the pin lifter so as to prepare the cars for a second attempt at automatic coupling. After several failed attempts with the pin lifter, DeBiasio had to place one foot inside the rail and between the cars in order to try to manually open the knuckle. At this point, DeBiasio heard a loud impact against the cars on track 3 and was pushed over by the oncoming cut of cars. His left arm was caught under the wheels of one of the cars, resulting in its amputation at the shoulder.

On April 3, 1992, DeBiasio brought this action against IC alleging negligence in violation of FELA, and the failure to maintain couplers which couple automatically upon impact, in violation of FSAA. The case went to trial before a jury on May 18, 1994. The jury returned a verdict in favor of DeBiasio and awarded $4,201,000 in damages. The district court denied IC's motions for judgment as a matter of law, or, in the alternative, for a new trial on all issues, or in the alternative for a new trial on damages or a remittitur. A timely motion of appeal was filed.

## II.

IC claims three grounds for reversal of all or part of the jury's verdict: (1) insufficiency of the evidence as a matter of law; (2) errors in the admission and exclusion of certain evidence; and (3) excessiveness of the verdict and a failure to mitigate damages.[1] We will address each issue in turn.

### A. Judgment as a Matter of Law and Motion for a New Trial

 DeBiasio's claim rests on alleged violations of FSAA and FELA. At the conclusion of the presentation of the evidence, IC moved for judgment as a matter of law on these claims. We review *de novo* the district court's denial of a motion for judgment as a matter of law. *Frazier v. Norfolk & Western Ry. Co.*, 996 F.2d 922, 924 (7th Cir.1993). Our inquiry is limited to whether the evidence, when viewed in the light most favorable to the nonmoving party and drawing all reasonable inferences therefrom, is sufficient to support the jury's verdict. *Id.* (quoting *Siddiqi v. Leak,* 880 F.2d 904, 908 (7th Cir. 1989)). After the jury's verdict, IC also moved for a new trial, contending that the verdict was against the manifest weight of the evidence. We will reverse the district court's decision to deny IC's motion for a new trial only if an abuse of discretion is demonstrated. *M.T. Bonk Co. v. Milton*

---

1. IC also cites to several portions of the trial transcript where the trial judge made statements which allegedly biased or prejudiced IC's counsel in the presentation of its defense. A careful review of the trial transcript in its entirety indicates that this claim has so little merit that we need not address it further.

*Bradley Co.,* 945 F.2d 1404, 1407 (7th Cir. 1991).

### 1. FSAA

■ The FSAA imposes certain absolute duties upon railroads to outfit their cars with safe equipment. "[A] failure of equipment to perform as required by the Safety Appliance Act [FSAA] is in itself an actionable wrong, in no way dependent upon negligence and for the proximate results of which there is liability—a liability that cannot be escaped by proof of care or diligence." *O'Donnell v. Elgin J. & E. Ry. Co.,* 338 U.S. 384, 390, 70 S.Ct. 200, 204, 94 L.Ed. 187 (1949). "Once the violation is established, only causal relation is in issue." *Carter v. Atlanta & St. Andrews Bay Ry. Co.,* 338 U.S. 430, 434, 70 S.Ct. 226, 229, 94 L.Ed. 236 (1949). Although the FSAA does not itself create a private right of action, employees alleging injury resulting from a violation of the FSAA may sue under FELA, 45 U.S.C. § 51. *See Crane v. Cedar Rapids & Iowa City Ry. Co.,* 395 U.S. 164, 166, 89 S.Ct. 1706, 1708, 23 L.Ed.2d 176 (1969).

DeBiasio claims that IC has violated § 2 of the FSAA, which provides as follows:

> It shall be unlawful for any railroad to haul or permit to be hauled or used on its line any car not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.

45 U.S.C. § 2. Congress enacted this provision in 1893 in an effort to reduce the number of injuries which occurred when railroad workers were forced to stand between the cars as they moved, sometimes at speeds reaching 12 miles per hour, during the coupling process. *Lisek v. Norfolk & Western Ry. Co.,* 30 F.3d 823, 826 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 904, 130 L.Ed.2d 787 (1995) (citing *United Transp. Union v. Lewis,* 711 F.2d 233, 247 n. 34 (D.C.Cir.1983)). Although the statutory language itself only speaks to the risk of requiring railroad workers to go between the ends of two cars to uncouple them, the Supreme Court has long held that this language applies to coupling as well as to uncoupling.

*Johnson v. S. Pacific Co.,* 196 U.S. 1, 18–19, 25 S.Ct. 158, 161–62, 49 L.Ed. 363 (1904).

■ The courts have enunciated two manners in which a plaintiff can establish the railroad's liability for an accident involving a coupling mechanism. The first avenue for establishing liability is to provide evidence that two cars failed to couple automatically upon impact. "[I]t is the failure to couple that triggers the railroad's absolute liability under section 2." *Lisek,* 30 F.3d at 829. In *Affolder v. New York C. & St. L.R. Co.,* 339 U.S. 96, 98, 70 S.Ct. 509, 510, 94 L.Ed. 683 (1950), the Court held that the plaintiff could meet his burden under § 2 by showing a failure to couple automatically upon impact. The railroad's duty to have couplers which couple automatically upon impact "is an absolute one requiring performance 'on the occasion in question.'" *Id.* The plaintiff is not, therefore, required "to show a 'bad condition' of the coupler." *Affolder,* 339 U.S. at 99, 70 S.Ct. at 510–11; *accord Reed v. Philadelphia, Bethlehem & New England R.R. Co.,* 939 F.2d 128, 130 (3d Cir.1991) ("Because equipment failure itself suffices to fasten liability upon the railroad, an injured railworker need not show a defect in the coupler to recover for his injuries."). "In other words, the Act requires automatic coupling equipment and the failure to couple creates the nearly irrebuttable presumption that the Act has been violated." *Lisek,* 30 F.3d at 829.

■ The second method of establishing a violation of the FSAA is to show a defect in the coupling equipment. Although a plaintiff is not required to prove that the equipment was defective, *see Affolder,* 339 U.S. at 99, 70 S.Ct. at 510–11, evidence that an employee was forced to step in between the lines because of defective equipment can establish liability in "the absence of a failed coupling attempt." *Lisek,* 30 F.3d at 831. Furthermore, direct evidence of a defect obviates the need to determine whether the Act was violated by a failure to couple on the occasion in question. In *San Antonio & Aransas Pass Ry. Co. v. Wagner,* 241 U.S. 476, 483–84, 36 S.Ct. 626, 629–30, 60 L.Ed. 1110 (1916), "evidence of bad repair in the equipment" was sufficient to establish liability and thus, the Court stated, "[w]e need not in this case

determine ... that the failure of a coupler to work at any time sustains a charge that the Act has been violated."

■ The railroad, however, "cannot be liable when it utilizes equipment that complies with the statutory mandate [and thus couples automatically upon impact] and is not defective." *Lisek*, 30 F.3d at 830. Therefore, two narrow defenses have emerged which, if properly proven by the railroad, may allow it to avoid liability. Both defenses address a situation where the coupler was not "set properly." *Kavorkian v. CSX Transp., Inc.*, 33 F.3d 570, 573 (6th Cir.1994). Liability under § 2 "assumes that the coupler was placed in a position to operate on impact." *Affolder*, 339 U.S. at 99, 70 S.Ct. at 511. The first defense, which was recognized by the Court in *Affolder*, is the failure of railroad workers to ensure that at least one of the couplers was in the open position before impact. *Id.* If both couplers' knuckles are closed, the failure of the couplers to couple automatically upon impact is not that of the device. The second defense is a misaligned drawbar. Since "it is normal for nondefective automatic couplers to become misaligned, as a part of ordinary railroad operations, then it is simply not reasonable to hold that such misalignment amounts to a violation of the Act." *Lisek*, 30 F.3d at 830–31. In both instances, though, "the defendant railroad has the burden of proving that the couplers were not set properly at the time that they failed to couple automatically." *Kavorkian*, 33 F.3d at 573; *accord Maldonado v. Missouri Pac. Ry. Co.*, 798 F.2d 764, 768 (5th Cir.1986), *cert. denied* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762 (1987). "In other words, the defendant has to establish a separate cause for failure to couple, other than equipment failure." *Reed*, 939 F.2d at 132.

■ DeBiasio introduced evidence in support of both methods of establishing liability under the FSAA. Although no witness actually saw car 388423 fail to couple automatically upon impact, undisputed circumstantial evidence existed to support this conclusion. Wilson testified that the knuckle on car 388423 opened when he released the previous cut of three cars and Manestar confirmed that nothing unusual had occurred when those cars were released. Both DeBiasio and Manestar testified that they heard the cut of 6 cars make impact with the cars already standing on track 3. DeBiasio further testified that when he arrived at track 3 and discovered the gap, car 388423's coupler was closed. According to DeBiasio, based on his thirteen years of experience, this indicated that the cars had made impact but failed to couple automatically. The jury was entitled to conclude from this evidence that the couplers had failed to couple automatically upon impact and a § 2 violation had occurred. *See Clark v. Kentucky & Indiana Terminal R.R.*, 728 F.2d 307, 310–11 (6th Cir.1984) (upholding the use of circumstantial evidence to establish the failure of a coupler to couple automatically upon impact).

■ DeBiasio also provided evidence that the coupling mechanism on car 388423 was defective. DeBiasio himself testified that the pin lifter malfunctioned when he tried to open the coupler. An IC videotape taken soon after the accident, which depicted an employee attempting to open the coupler with the pin lifter and having to resort to opening it manually, further supports evidence of a defect. Finally, DeBiasio introduced two expert witnesses, Rufus Dipprey and Frank Appelt, who opined that the knuckle thrower DeBiasio attempted to open at the time of the accident was broken. While IC fiercely contested these conclusions, the jury was entitled to credit the testimony offered by DeBiasio.

■ IC cannot avail itself of either of the two defenses to liability under § 2. Other than asking a few hypothetical and conjectural cross-examination questions of DeBiasio and his witnesses, IC introduced no evidence to support a misaligned drawbar or closed coupler defense. To the contrary, the evidence indicated no support for such defenses existed. Wilson testified that car 388423's coupler was open when it was released, foreclosing an *Affolder* closed knuckle defense. DeBiasio further testified that he did not notice that either draw bar on either car was misaligned. Since a misalignment sufficient to prevent a coupling would be noticeable, DeBiasio concluded that there was no misa-

lignment. Given that it was IC's burden to establish such defenses, the jury was entitled to conclude that there was no evidence of a misaligned drawbar or closed coupler in this case.

### 2. FELA

 FELA provides a "broad remedial framework for railroad workers" who suffer injuries during their employment. *Lisek*, 30 F.3d at 831. Under 45 U.S.C. § 51, railroads engaging in interstate commerce

> shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

Under FELA, the plaintiff's burden is significantly lighter than in an ordinary negligence case. *Lisek*, 30 F.3d at 832. The railroad is liable if "the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury...." *Harbin v. Burlington Northern R.R. Co.*, 921 F.2d 129, 131 (7th Cir.1990) (quoting *Rogers v. Missouri Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957)). A jury verdict in a FELA case can be set aside only when there is a complete absence of probative facts to support the conclusion reached. *Frazier*, 996 F.2d at 924.

 DeBiasio introduced sufficient evidence of negligence for the jury to conclude that the "slightest evidence of negligence" test had been satisfied. Rule 103(c) of the Illinois Central Operating Rules states that "[w]hen coupling, shoving, or switching cars, care must be taken to prevent damage and to avoid fouling other tracks. There must be sufficient room on the track to hold the cars." DeBiasio testified that he informed Manestar

that there was insufficient room on track 3 for the cut of 6 cars and, after impact with the cars already standing on track 3, they were indeed fouling the tracks. Dipprey, one of DeBiasio's expert witnesses, also testified that the tracks had been fouled in violation of Rule 103(c) when the cut of 6 cars was sent to track 3. Furthermore, there was evidence presented that IC had violated Operating Rule 833 by not maintaining "continuous radio contact" with DeBiasio so that he was informed of the next movement of cars, and it failed to maintain working lights at the area of the Yard where DeBiasio was injured. While the testimony was disputed on all of these points, the jury was entitled to credit DeBiasio's presentation of the evidence and hold IC liable, especially in light of FELA's low threshold for negligence.[2]

### B. Evidentiary Rulings

 The trial judge's evidentiary rulings are reviewed for abuse of discretion. *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 725 (7th Cir.1994). The determination that an error was made does not end our inquiry, though, for not all errors warrant reversal of the verdict below. *Holmes v. Elgin, Joliet & Eastern Ry. Co.*, 18 F.3d 1393, 1397 (7th Cir.1994). "[H]armless error with respect to the admission or exclusion of evidence is not cause for reversal." *Cook v. Navistar Int'l Transp. Corp.*, 940 F.2d 207, 212 (7th Cir. 1991) (quoting *Oriental Health Spa v. City of Fort Wayne,* 864 F.2d 486, 491 (7th Cir. 1988)). An erroneous evidentiary ruling is harmless and "does not affect substantial rights unless there is a significant chance that it has affected the result of the trial." *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 313 (7th Cir.1986); *see* Fed. R.Civ.P. 61; Fed.R.Evid. 103(a).

### 1. Authentication of Exhibit 33

One of DeBiasio's expert witnesses, Frank Appelt, testified to the specific manner in which he believed car 388423's knuckle thrower was broken. Although he had not

---

**2.** IC, in passing, suggests in its brief that the trial judge improperly charged the jury on averments of negligence not supported by the evidence. It does not point to any erroneous instruction.

There was clearly evidence introduced to support each theory of negligence. That this evidence was contested does not merit rejection of a jury instruction on these points.

examined the actual knuckle thrower, he reasoned that "[t]he tail end of it off the fore end of it was broke off because it wouldn't contact the tail of the knuckle and push it open." (R. 411). IC sought to impeach this testimony by introducing exhibit 33, which IC claimed to be the actual knuckle thrower off the coupling mechanism in car 388423. The trial judge initially refused to allow IC to introduce exhibit 33, on the grounds that it had not been properly authenticated as the knuckle thrower in question, although he did permit IC's counsel to secure an admission from Appelt that exhibit 33 was not broken. During IC's presentation of its case, it introduced testimony from David Hall, the IC employee in charge of investigating the accident, that he had directed M.O. Jones to retrieve the coupler off of car 388423 and bring it to him. He also testified that the knuckle thrower Jones brought to him was now labeled exhibit 33. At this point, the jury knew that exhibit 33 was not broken, but it did not know whether exhibit 33 was the actual knuckle thrower DeBiasio's expert had claimed to be broken. When IC called Jones to testify that he did indeed retrieve the knuckle thrower from the proper car and handed it to Hall, DeBiasio objected on the grounds that IC had not, under Fed.R.Civ.P. 26(a)(2) or Local Rule 5.00, disclosed Jones as an expert or the exhibits upon which he was going to rely upon in his testimony. IC countered that, at least insofar as he would authenticate exhibit 33 as car 388423's coupler, Jones was an impeachment witness not testifying as an expert at all. Moreover, his status as an expert had been revealed during deposition. Although he was allowed to testify as an expert, the trial judge ruled that Jones could not testify as to his actions in retrieving exhibit 33 from car 388423 because this testimony was not disclosed before trial.

▮▮▮▮▮ The trial judge does appear to have abused his discretion in excluding Jones' testimony. Exhibit 33, if properly authenticated, was impeachment evidence for Appelt's testimony that the knuckle thrower had to be broken in a particular manner. The evidence was not offered to prove that the coupler could not be defective. It was offered only to establish that it could not have been defective in the manner described by Appelt. Rule 26(a)(3) of the Federal Rules of Civil Procedure does not require pretrial disclosure of evidence used "solely for impeachment purposes," and Local Rule 5.00 does not require nondemonstrative exhibits to be listed on the pretrial order unless they will be "offered in evidence."[3] Nor can Jones' testimony be excluded as undisclosed expert testimony. IC's counsel made clear to the trial judge that Jones' testimony regarding his handling of the coupler for car 388423 was separable from his testimony as an expert.[4] A witness is not an expert to the extent he testifies as to matters within his personal knowledge. *Richardson v. Consolidated Rail Corp.*, 17 F.3d 213, 218 (7th Cir. 1994). The bases of his opinions need not be disclosed before trial. *Id.* Thus, it was error for the trial judge to exclude the testimony which would connect up the coupler presented to Appelt with the coupler in car 388423.

▮▮▮ Despite the error, we cannot say that it was reversible error. The authentication of exhibit 33 would have only addressed whether the coupling mechanism on car 388423 was defective. DeBiasio, however, presented undisputed evidence that the couplers had failed to couple automatically upon impact. This is sufficient to establish a violation of FSAA even if DeBiasio had never presented any evidence of a defect. *See Affolder*, 339 U.S. at 98–99, 70 S.Ct. at 510–11. Since IC failed to provide any evidence to support a misaligned drawbar or closed knuckle defense, no reasonable jury could have failed to find such a violation. Thus, the error could not have affected the result of the trial. *Walton*, 786 F.2d at 313.

---

**3.** All demonstrative evidence or experiments to be offered during trial must be listed in the pretrial order, but exhibit 33, at least insofar as it was offered to impeach Appelt's testimony, was not demonstrative evidence or an experiment.

**4.** Jones was in fact allowed to testify as an expert to the extent his testimony was disclosed to DeBiasio during his deposition. Only his testimony regarding the retrieval of the knuckle thrower from car 388423 was excluded.

## 2. Day in the Life Video

 DeBiasio offered into evidence a video depicting him in his daily routine since the amputation. IC objected that the video, which included frequent shots of him interacting with his family, would prompt the jury to award damages to him for his family's loss instead of solely as compensation for DeBiasio's injuries. *See New York C. & Hudson River R.R. Co. v. Tonsellito,* 244 U.S. 360, 37 S.Ct. 620, 61 L.Ed. 1194 (1917) (jury not entitled to consider damages for non-railroad employees). The trial judge viewed the video in its entirety outside the presence of the jury. When the video was displayed before the jury, the trial judge explicitly instructed the jury that they were not to consider the accident's harm to his family. Finally, DeBiasio was both present in the courtroom and subject to cross-examination. "The possibility that a film will be prejudicial is significantly reduced when the subject of that film can be cross-examined at trial." *Bannister v. Town of Noble, OK,* 812 F.2d 1265, 1270 (10th Cir.1987) (discussing "Day in the Life" video). Thus, we do not find that the trial judge abused his discretion in admitting the video into evidence.

## C. Damages

The jury returned a verdict of $4,201,000 in favor of DeBiasio. $1,500,000 was apportioned for disability, $1,500,000 for pain and suffering experienced and reasonably expected to be experienced in the future, $51,000 for past lost earnings, and $1,150,000 for the value of lost future earnings reduced to present value. IC argues that the damage award is excessive in general, and in particular, the award for loss future earnings bears no rational connection to the evidence.

 A trial judge may vacate a jury's verdict for excessiveness only when the award was "monstrously excessive" or the award has "no rational connection to the evidence." *Holmes,* 18 F.3d at 1395; *Frazier,* 996 F.2d at 925. When making this determination, "[t]he trial court may take into account whether the award is out of line when compared to other awards in similar cases." *Holmes,* 18 F.3d at 1396. We review the district court's decision not to order

a remittitur or a new trial on damages under "the extremely limited abuse of discretion standard." *Frazier,* 996 F.2d at 925 (quoting *Joan W. v. City of Chicago,* 771 F.2d 1020, 1023 (7th Cir.1985)).

### 1. Rational Connection Between Evidence and Award

 IC first contends that the jury's award of $1,150,000 for the value of future lost earnings was not supported by the evidence. All witnesses agreed that DeBiasio would be unable to return to work as a switchman as a result of the accident. DeBiasio offered the expert testimony of a professor of finance, Charles Linke, to estimate the amount of money DeBiasio would need today to replace his earnings as a switchman for the rest of his work life expectancy. Linke estimated that, including money earnings and loss of health care benefits, DeBiasio would need between $1,083,635 and $1,235,966 to replace his earnings as a switchman. DeBiasio therefore satisfied his general burden of introducing evidence as to the amount of money he is now prevented from earning as a switchman because of the accident. *See Jones v. Consolidated Rail Corp.,* 800 F.2d 590, 593 (6th Cir.1986) (citing *Shupe v. New York Cent. Sys.,* 339 F.2d 998, 1000 (7th Cir.), *cert. denied,* 381 U.S. 937, 85 S.Ct. 1769, 14 L.Ed.2d 701 (1965)).

IC contends that the jury's award for loss of future earnings failed to take into account DeBiasio's ability to work in the future. Several of DeBiasio's medical experts admitted on cross-examination that his injury did not preclude him from working in some capacity in the future. DeBiasio admitted that he turned down two jobs offered to him by the railroad, one as a yardmaster and the other as a dispatcher, because of the stress he would suffer in returning to the environment in which he was injured. A psychologist testified that DeBiasio was justified in rejecting such jobs because of the effect they would have on his future mental health and stability. DeBiasio also testified that he had tried to work as a laborer in his brother's construction business, but had to quit after three weeks because he was developing tendinitis in his right arm.

■ DeBiasio clearly had the duty to mitigate his damages. *Schneider v. National R.R. Passenger Corp.,* 987 F.2d 132, 136 (2d Cir.1993); *Jones,* 800 F.2d at 593. "However, once it is established that a duty to mitigate is present, the burden nevertheless falls on the wrongdoer to show that the damages were lessened or might have been lessened by the plaintiff." *Jones,* 800 F.2d at 593. IC did secure admissions that DeBiasio's injuries did not foreclose his ever working again in any capacity. The only jobs IC contended were reasonably available to him, though, were the two jobs with the railroad which he would have been emotionally unable to handle according to his psychologist. IC presented no counter evidence that DeBiasio could have handled the jobs offered to him. Nor did IC offer any evidence as to other jobs available to DeBiasio and at what salaries. Considering his search for another job in his brother's business, and his chiropractor's testimony that he will continue to suffer muscle spasms and be subject to the risk of shoulder and back injury, the jury was entitled to find that DeBiasio had satisfied his duty to mitigate. In fact, the jury's award for lost future earnings was over $85,000 less than the upper range figures provided by Linke. Having failed to present competent evidence at trial of the potential future wages available to DeBiasio, IC cannot now complain on appeal that the jury failed to reduce his lost future earnings more than it did. *Cf. Aldridge v. Baltimore and Ohio R.R. Co.,* 789 F.2d 1061, 1068 (4th Cir.1986) (Railroad failed to present evidence which would have permitted the jury to reduce the value of lost future earnings to present value). Thus, the trial court did not abuse its discretion in denying IC's motions for relief.

2. Excessiveness of the Verdict

■ IC cites two cases from this court in an attempt to demonstrate that the $4,201,-000 awarded to DeBiasio was "monstrously excessive." Neither of these cases, however, is either factually similar, or even a FELA case, where large jury verdicts in state and federal court are not uncommon. *Frazier,* 996 F.2d at 926. In *Davis v. Consolidated Rail Corp.,* 788 F.2d 1260, 1262–63 (7th Cir. 1986), no one challenged the jury verdict of $3 million for a leg amputation and thus the issue was not before the court. Even so, the court's comment in dicta that "$3 million—only $170,000 of which represents lost earnings and past and future medical expenses—may well be excessive," does nothing to question the result in this case. In *Davis,* as the court's comment illustrates, the trouble with the verdict was not so much the amount as how much was apportioned to pain and suffering and disability. In the instant case, by contrast, $1.2 million of the damages represented lost earnings. Nor is *Mason v. F. LLI Luigi & Franco Dal Maschio,* 832 F.2d 383, 388 (7th Cir.1987) instructive. In *Mason,* we upheld an $800,000 jury verdict for a woman who lost one-third of her right forearm. Yet, she found a job after the accident which paid her more than she had earned previously, and her lost wages and medical expenses were stipulated to be only $17,-894.24. Thus, the circumstances justified a lower award than in the instant case.

Courts have often upheld large verdicts in FELA cases. In *Frazier,* this court upheld a $2.3 million award for a back injury for an individual who did not require continued medical treatment or prescription pain medication, and could lift objects weighing under fifty pounds. *Id.,* 996 F.2d at 926; *see Lewis v. Illinois Cent. R.R. Co.,* 234 Ill.App.3d 669, 175 Ill.Dec. 573, 575, 600 N.E.2d 504, 506 (1992) ($3,935,700 award for back injury). In *Schneider,* 987 F.2d at 137–38, a FELA jury verdict of $1.75 million was upheld "where the only physical injuries were multiple contusions, laceration of the tendon in the left thumb and laceration of the nerve in the left thumb." *Frazier,* 996 F.2d at 926. In *Smith v. National R.R. Passenger Corp.,* 856 F.2d 467, 472 (2d Cir.1988), the jury awarded $3.5 million to a railroad employee whose kneecap was shattered. Finally, in *Merrill v. Chicago & Illinois Midland Ry.,* 751 F.Supp. 770 (C.D.Ill.1990), after a FELA and FSAA trial, a jury awarded over $9 million to a mechanic at a coal transfer plant whose left arm was amputated during an attempt to rerail a derailed car. Although the case was ultimately dismissed, the jury verdict itself was not found to be excessive by the trial judge. *Id.* at 775 ("Were we not now allowing this cause

to proceed to [Longshoreman and Harbor Workers' Compensation Act] proceedings, we would gladly enter judgment on that jury verdict.").

DeBiasio also cited several arm amputation cases in Cook County where similarly large verdicts were awarded.[5] *See, e.g., Cancino v. Goss & De Leuw, Inc.*, No. 78L–25744 (Cook Cty. Cir.Ct., July 10, 1987) ($3,560,607); *Skelton v. Chicago Transit Auth.*, No. 81L–28517 (Cook Cty. Cir.Ct., April 14, 1989) ($7,824,655). When compared to these other awards, we cannot say that the jury's award to DeBiasio is "monstrously excessive," or that the trial court abused its discretion in denying IC's motion for a new trial on damages.

### III.

For the above reasons, the judgment is AFFIRMED in all respects.

---

**5.** IC claims that the reported figures must be discounted because some of the awards were reduced for the plaintiff's contributory negligence or assumption of risk. These reductions, however, do not change the total amount the jury thought necessary, before adjusting for comparative fault, to make the plaintiff whole. In this case, the jury found DeBiasio to have not been contributorily negligent.