David A. ROBB, Plaintiff,

v.

**BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY and Union Tank Car Company, Defendants.**

**No. 98 C 2591.**

United States District Court,
N.D. Illinois,
Eastern Division.

June 13, 2000.

John S. Bishof, Jr., Yaeger, Jungbauer, Barczak & Roe, Ltd., Chicago, IL, Ronald J. Barczak, Yaeger, Jungbauer, Barczak & Roe, Ltd., Minneapolis, MN, for Plaintiff.

Kenneth J. Wysoglad, Kenneth J. Wysoglad & Assoc., John F. Newell, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

David Robb lost his foot after he was injured during a switching job in East Yard of the the Burlington Northern and Santa Fe Railway Company (the "Railway") in Eola, Illinois. He sued the Railway under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* (FELA) (Count I), the Federal Safety Appliance Act, 49 U.S.C. § 20301, *et seq.* (FSAA) (Count II),[1] and sued the Railway and Union Tank Car Company under a state law negligence claim (Count III). Union Tank Car was later dismissed from the

---

1. The FSAA does not create an independent cause of action for those injured because of a violation of the Act; however, for railroad employees injured because of a FSAA viola- tion, FELA provides the cause of action. *Crane v. Cedar Rapids & Iowa City Ry. Co.,* 395 U.S. 164, 166, 89 S.Ct. 1706, 23 L.Ed.2d 176 (1969).

case by stipulation. The Railway and Mr. Robb each now move for summary judgment on Mr. Robb's claim that the Railway violated the FSAA. I deny both motions. Each party makes several other motions as well that I grant in part and deny in part.

## I.

At the time of the accident, Mr. Robb was performing a switching operation. He was in a crew engaged in uncoupling cars and sending them down various tracks. They were to be included in trains that would leave the yard that evening or the following day. The events leading to the accident began when Paul Krause, the crew foreman, pulled the pin on the coupler connecting two cars, Union Tank Car UTLX72192 ("UTLX") and DMIX200010 ("DMIX"), detaching them and sending them towards Mr. Robb on track eleven. Mr. Robb noticed that one of them (UTLX72192) did not belong there, while Mr. Krause noted that Mr. Robb was working by the north rail.

There is disagreement about what happened next. Mr Robb says that he thought the cars were going too slowly and might roll back, posing a danger to property and persons in the yard, so he boarded UTLX and attempted to tighten the hand brake. At his first try, he was able to move the brake wheel about half a turn, but then met resistance. He said it felt as if all the slack in the hand brake chain was taken up. He got off, pulled the pin, and then got back on and tried the hand brake again, but the brake wheel suddenly lost tension and turned freely without the resistance Mr. Robb expected, causing him to fall between the still moving cars. He rolled or sprung out, but not without injuring his foot. According to the Railway, however, Mr. Robb was injured when, walking beside DMIX, he put his foot on the north rail and attempted to tighten the hand brake on that car. After Mr. Krause finished pulling the pin, he looked around and saw Mr. Robb hobbling by the north

rail, and blood was found on that rail after the accident.

Mr. Robb's right foot was run over and he says that it ultimately had to be amputated. Various employees assigned to inspect and repair the hand brake noted that it had a broken brake shoe, two worn brake chains, welded brake chains, missing brake chain clevicles, a bent body bracket, a worn out top rod, and missing brake connection pins; in short, it was in sorry shape.

## II.

The Railway, in its own motion for summary judgment, argues that the condition of the hand brake does not matter because the FSAA applies only to railroad cars that are "in use," and UTLX was not "in use" within the meaning of the law. The Railway invokes *Phillips v. CSX Transp. Inc.*, 190 F.3d 285 (4th Cir.1999). Under this case, "the FSAA does not apply to train cars involved in switching operations." *Id.* at 289 (*citing United States v. Seaboard Air Line Railroad Co.* 361 U.S. 78, 80, 80 S.Ct. 12, 4 L.Ed.2d 25 (1959)). The Fourth Circuit found that the train there was not "in use" because the plaintiff was injured at the end of the switching process rather than at the beginning of the departure process. *Id.* at 290. The "switching" exclusion therefore applied.

■ The Railway contends that the facts of *Phillips* are close enough for that case to govern here. However, under the plain language of the statute, the only sensible construction of its purpose, and the clear meaning of the Supreme Court precedent interpreting the provision, the "switching" exclusion from *Seaboard* does not apply to the provision of the FSAA that Mr. Robb invokes, the hand brake provision. The statute imposes different requirements for "vehicles" and "trains." "Vehicles" must have "efficient hand brakes," 49 U.S.C. § 20302(a)(1)(B), but "trains" require "power or train brakes."

*Id.* § 20302(5)(A) & (B).[2] The obvious reason for the difference is that a train, cars coupled together and moved over distances, *Seaboard,* 361 U.S. at 80, 80 S.Ct. 12, can only be safely stopped with a power brake, but a car or other vehicle can be safely stopped with a hand brake. *Phillips* can be distinguished because it involved a worker who was injured on a "completed train," 190 F.3d at 287, while Mr. Robb was injured on a car that was not part of a completed train. As I explain below, this makes all the difference.

In *Seaboard,* the Supreme Court addressed itself to "the meaning of the word 'train' as used in the Act." 361 U.S. at 80, 80 S.Ct. 12. It is in the context of defining "train" that the Court stated that " 'switching operations' were not 'train' movements within the meaning of the Act ...." *Id.* The cases cited in *Seaboard* address the applicability to certain factual situations of "the air-brake requirement," *United States v. Chicago, Burlington & Quincy R.R. Co.,* 237 U.S. 410, 412, 35 S.Ct. 634, 59 L.Ed. 1023 (1915), now the power or train brake requirement, of § 20302(5)(A) & (B) (as they are now codified). It is only when a "train" is involved and that train is "in use" that the power or train brake provision applies. The restriction that a "train" must be "in use" does not extend to the hand brake requirement for "vehicles" of § 20302(a)(1)(B).

The Railway's claim that if a "train" is not "in use," the FSAA as a whole is inapplicable is absurd. The Supreme Court explained that "the air-brake provision deals with running a train, while the other requirements relate to hauling or using a car." *United States v. Erie R. Co,*

237 U.S. 402, 407, 35 S.Ct. 621, 59 L.Ed. 1019 (1915) (*cited* favorably in *Seaboard* ):

> In one a train is the unit and in the other a car. As the context shows, a train ... consists of an engine and cars which have been assembled and coupled together for a run or trip along the road. When a train is thus made up and is proceeding on its journey it is within the operation of the air-brake provision.

*Id.* The Court then determined that other provisions of the statute govern switching:

> But ... the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains, and whereby incoming trains which have completed their run are broken up ... are ... mere switching operations, and so are not within the air-brake provision. The other provisions calling for automatic couplers and grab irons are of broader application and embrace switching operations as well as train movements, for both involve a hauling or using of cars.

*Id.* at 408, 35 S.Ct. 621. The hand brake provision is one of these provisions of "broader application," and indeed the statute will bear no other rational reading, since you cannot safely stop a train with a hand brake. It is precisely because safety in the yard during switching operations calls for efficient hand brakes that can stop cars and other vehicles that Congress passed the hand brake provision.

The Railway here essentially asks me to read the hand brake provision out of the FSAA, to hold that it applies only to trains in use—where a hand brake could do little good, leaving cars and other vehicles that have not been assembled into trains outside the scope of federal safety legislation,

**2.** The relevant language of the FSAA reads:

> [A] railroad carrier may use or allow to be used on any of its railroad lines—
> (1) a vehicle only if it is equipped with—
> (B) ... efficient hand brakes; and ...
> (5) a train only if—
> (A) enough of the vehicles in the train are equipped with power or train brakes so that the engineer on the locomotive hauling the

> train can control the train's speed without the ... brake operators using the common hand brakes...; and
> (B) at least 50 percent of the vehicles in the train are equipped with power or train brakes and the engineer is using the power or train brakes on those vehicles and on all other vehicles equipped with them that are associated with those vehicles in the train.
> 49 U.S.C. § 20302(a)(1)(B), (5)(A) & (B).

while the statutory language that expressly requires that "vehicles" must have "efficient hand brakes" languishes. I will not adopt a construction that renders a statutory provision superfluous unless I am forced to. *Kopec v. City of Elmhurst,* 193 F.3d 894, 902 (7th Cir.1999). The literal application of the statute will not "produce a result demonstrably at odds with the intentions of its drafters," *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), justifying a departure from the plain meaning; on the contrary. I therefore deny the Railway's motion for summary judgment on Mr. Robb's FSAA claim.

### III.

■ Mr. Robb in turn moves for partial summary judgment, arguing that the statute requires that a railway carrier may use a "vehicle" on its lines only if it has an "efficient hand brake." 49 U.S.C. § 20302(a)(1)(B). He offers testimony as to the condition of the hand brake, essentially that it was shot, and cites case law that a hand brake in that condition is not "efficient." If it was in that condition, I agree as a matter of law that it was not "efficient." Because a railroad's duty under the FSAA is absolute, the employee must prove only that the statute was violated; no showing of negligence is required. *Lisek v. Norfolk and Western Railway Company,* 30 F.3d 823, 825–826 (7th Cir.1994).[3]

■ However, Mr. Robb concedes that there is still a material issue of fact as to whether the condition of the UTLX hand brake caused Mr. Robb's injuries. Fault is not an element of a violation of that statute, but causation certainly is. *See DeBiasio, v. Illinois Central Railroad,* 52

F.3d 678, 683 (7th Cir.1995) ("Once the violation is established, only causal relation is in issue."). This precludes summary judgment on the FSAA count. Several other matters require discussion, however.

### A.

The Railway contends that the testimony of several witnesses as to the condition of the hand brake on UTLX will not support summary judgment because: (1) Mr. Robb did not disclose them as experts; (2) their testimony does not address whether the condition of the brake was in violation of the FSAA; (3) the plaintiff has not shown that their testimony constitute admissions that might bind the Railway; and (4) one of the witnesses, a Mr. Nicholas Diaz, gave testimony that was suspect because there were indications that he had been improperly coached.

However, the witnesses are fact witnesses as to the condition of the brake, not expert witnesses. The only question of opinion discussed by either party on which the witnesses might have a view is whether, if the brake's condition was as shabby as they observed it to be, there was a violation of a federal law; and on that subject, the only opinion that counts in this court is mine. Whether the testimony of the witnesses are admissions is beside the point. The question is whether it is relevant, credible, and otherwise admissible, and this is not disputed, except for the testimony of Mr. Diaz. Finally, whatever the defects of Mr. Diaz's testimony, it does not stand alone.

### B.

■ The Railway also argues, however, that the defective hand brake did not cause Mr. Robb's injuries, and its condition

---

**3.** For this reason, the Railway's argument that Mr. Robb's injury was caused by his alleged violation of safety rules rather than the condition of the hand brake is not to the point. The Railway cites *Beimert v. Burlington Northern, Inc.,* 726 F.2d 412 (8th Cir. 1984), but since in this circuit, the railroad's

duty under the FSAA is "absolute," the defendant cannot get around this rule by presenting what is for all practical purposes a contributory negligence defense as a causation argument. In the Seventh Circuit, fault is irrelevant.

is therefore immaterial. The Railway offers, first, the expert testimony of Dr. Owen Schipplein, Ph.D. He concluded that that "the most probable scenario for the accident is that Dave Robb was walking along the north rail, or placing his foot on the north rail for leverage, next to [car] DMIX, while attempting to apply the hand brake on DMIX200010." Mr. Robb objects that his testimony flunks the requirement that expert testimony must be reliable to be admissible. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Evidence that is inadmissible because it is unreliable under *Daubert* cannot be used to oppose a summary judgment motion. *Porter v. Whitehall Laboratories,* 9 F.3d 607, 612 (7th Cir.1993). Although reliable expert testimony is no less competent as evidence than testimony from personal knowledge, a defendant cannot avoid summary judgment by manufacturing "genuine" questions of material fact with unreliable expert testimony.

■ The Supreme Court has held that reliability is the touchstone for expert testimony on "scientific, technical, or other specialized knowledge." *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. A trial judge, acting as "gatekeeper," must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* In *Kumho,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238, the Court extended this gatekeeping requirement from scientific to all expert testimony. In fulfilling my "gatekeeping function," I must determine, first, whether the testimony has been subjected to the scientific method, and, second, whether the testimony would be helpful. *Deimer v. Cincinnati Sub–Zero Products, Inc.,* 58 F.3d 341, 344 (7th Cir. 1995); Fed.R.Evid. 702. As to the first requirement, four factors have been authoritatively established as bearing on the reliability of expert testimony: (1) the

testability of the hypothesis; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the technique is generally accepted. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. These conditions are not all necessary, *id.,* but Dr. Schipplein's testimony passes none of them, and offers no other indicia of reliability that might serve in their stead.

■ Dr. Schipplein is a Ph.D. in mechanical engineering who has published an analysis of lifting and has done research in sports medicine. He gives "accident investigation and reconstruction" as an area of specialization on his vita, but his only formal training in the area is a non-degree program in traffic accident reconstruction at the Northwestern University in 1994. He has no formal training, publications, or listed research in railroad accident reconstruction. He does not claim to have any experience in this area either. His vita lists "cases he has been involved with" as including "automotive, aviation, bicycle, work-related, slip and fall accidents," but not railroad accidents. Someone need not be a specialized railroad accident investigator to have a reliable expert opinion about a railroad accident, of course. A qualified accident investigator might produce a reliable analysis of a railroad accident despite lack of training, publications, or experience in the area, but Dr. Schipplein has not done so.

According to Dr. Schipplein, the accident could not have occurred as Mr. Robb claims because, first, it would have taken him at least 45 seconds to turn the brake wheel twice, getting off and on the car once in the middle, and DMIX, the lead car, traveling at three m.p.h. would have already coupled with other cars on the track. The 45 seconds comes from a timing observation made with a surrogate "performing the braking procedure described by Robb," on a stationary car. But it was not the "braking procedure described by Robb" if it was not done with

a brake that was similarly defective and was done on a nonmoving car. Dr. Schipplein's report describes his "surrogate" as "an experienced railroad man," but does not show that he was comparable in experience, skill, or physical ability to Mr. Robb.

The reliability of Dr. Schipplein's other figures may be discussed in connection with his opinion that if the accident had happened as Mr. Robb had claimed, he would have been run over and killed. The Railway says that it is a "mathematic [sic] fact that an object moving at 3 MPH will cover 4.4 feet per second."[4] This calculation is based on a "fundamental mathematical principle that is taught in grade school mathematics and all standard physics texts." The formula is true, but Dr. Schipplein provides unreliable values for his variables.

The three m.p.h. figure is derived from Mr. Robb's deposition—although Mr. Robb's testimony only supports the claim that he thought that the speed was around "two to three miles an hour," an apparently substantial difference. Mr. Robb clearly states that he "didn't pay attention" to exactly how fast the cars were going. Dr. Schipplein picks the higher figure without justifying this choice. He does not explain what difference, if any, it might make to whether the cars would have already coupled or to the severity of Mr. Robb's injuries if the speed were two m.p.h. or in any event within a reasonable margin of error in estimating speeds for someone who is not paying attention. The Railway insists that Mr. Robb is stuck with a three m.p.h. estimate. He is not—at worst he would be stuck with the estimate of "two or three" m.p.h., and Dr. Schipplein gives no calculations based on the lower estimate.

In any event, the question with expert testimony is not whose burden it is to show what, but whether the testimony is reliable. It is the duty of the *court* to act as gatekeeper. *Daubert*, 509 U.S. at 589,

113 S.Ct. 2786. Dr. Schipplein cannot reliably conclude that the accident could not have happened as Mr. Robb said if he did not even consider the possibility that Mr. Robb might have been plausibly· wrong about the speed, or right about the lower speed.

Moreover, Dr. Schipplein derived the distances, crucial for measurement of the times, from the inconsistent deposition testimony of others or by someone's pacing it off. In his deposition, he refers to Mr. Robb's own "guess" of 250 feet between himself at the point of the accident and Mr. Krause, the foreman, stating that this is "consistent" with "the other information I have of the measurement taken"; Dr. Schipplein gives one measure as 264 feet based on "the resting position of the cars"; another figure of 246 feet, and another of 86 steps. Presumably Dr. Schipplein might have personally measured the distance from the blood on the tracks to Mr. Krause's location, and the Railway now avers that he did, but if so, he did not testify to it in his deposition, and the Railway's promise that he would if I were to let him testify as an expert puts the cart before the horse.

Dr. Schipplein argues, further, the accident could not have happened as Mr. Robb claims on the grounds that Mr. Krause looked away for only a couple of seconds to uncouple the cars, then looked back and saw Mr. Robb injured, because the hand brake maneuver would have taken at least 45 seconds, derived as above. Asked, "What do you base that time frame on?", Dr. Schipplein replied, "Just based on the knowledge of human factors and the human movement .... To turn a body from 180 degrees, reach out an arm and lift up a pin lifter would not take a great deal of time," Mr. Krause, however, did not testify, and Dr. Schipplein did not ask him, how long this action in fact took him. It is not good method to apply such a broad gener-

---

4. Because there are no physical objects in mathematics, it is actually a physical fact based on a mathematical truth, but the distinction makes no difference here.

alization to a particular set of circumstances when a few seconds or tens of seconds might make a all the difference, and nothing indicates whether everything went the way it normally would. Not to put too fine a point on it, Dr. Schipplein just guessed how long it took Mr Krause to do that job.

The rest of Dr. Schipplein's report is vitiated by similar defects. If there is a methodology here as opposed to an ad hoc set of unexamined assumptions drawn in part from the record, in part from a reconstruction of unexplained value, and in part from nothing at all, Dr. Schipplein has not explained what it is. He has not shown that that his "biomechanical analysis" is testable, subject to peer review or publication; he has not provided an error rate or a basis to think that it was generally accepted. Indeed, given his procedures, it would be surprising if it were any of these things. His report references a biomechanics text and a human factors book, but not for any specific propositions, much less to show that his approach to railroad accident reconstruction is reliable. He invokes a true mathematical formula, but plugs in values for the variables based on arbitrary assumptions.

In addition to being unreliable, Dr. Schipplein's testimony is not helpful. If the Railway wishes to argue that the accident did not or could not have happened as Mr. Robb contends on the basis of the deposition testimony of various fact witnesses, which is the only admissible basis in the record for this conclusion, the jury can evaluate this argument without the spurious precision of Dr. Schipplein's report and the misleading glow of his impressive but irrelevant academic credentials. I hold that Dr. Schipplein's approach is unreliable and unhelpful, and therefore inadmissable.

## C.

The Railway argues, second, that there is evidence apart from the testimony of Dr. Schipplein that creates a genuine issue of material fact. First, it cites the testimony of Walt Viertel, an employee who investigated the accident and testified, based on his examination of photographs of the hand brake prior to repair, that in his judgment the hand brake was operating efficiently and the alleged defects did not impede its operation. This would be expert opinion testimony, and because Mr. Viertel was neither disclosed nor qualified as an expert, his testimony is inadmissable.

Second, the Railway argues that the accident occurred as Dr. Schipplein stated, when Mr. Robb allegedly attempted to adjust the hand brake on the DMIX car, putting his foot on the north rail where it was run over. In support of this, the Railway introduces testimony that: (1) there was blood on the north rail where the DMIX handrail was, (2) the plaintiff was positioned by the north rail before the accident, and Mr. Krause observed him hobbling by the north rail afterwards; (3) the custom of railroading would have been to mount the lead (DMIX) car; (4) had Mr. Robb fallen from UTLX, he would have fallen between the cars on the south rail where the UTLX rail was positioned, and would have been unable to move to the north rails with only an injury to the right foot; (5) Mr. Viertel, a post-accident investigator, concluded the accident happened when Mr. Robb attempted to tighten the DMIX handbrake.

As to (5), the Railway does not list or qualify Mr. Viertel as an expert, so his testimony is inadmissable; and (4) appears to depend on Dr. Schipplein's inadmissable testimony. But the evidence cited in (1)-(3) might support a verdict for the defendant. A jury might believe Mr. Robb's explanation that he fell across the rails and then cleared them by pushing himself away in time to save himself from death or serious injury, but it might conclude that the evidence of the blood on and his location by the north rail means that he was lying about what happened. That is a

credibility issue. Mr. Robb replies only that the Railway introduces no eyewitness testimony that contradicts his own. This is immaterial. Because Mr. Robb admits that causation remains in issue, and there is evidence that, regarded in the light most favorable to the nonmovant, would warrant a verdict for the Railway if believed, I must deny Mr. Robb's motion for summary judgment.

### V.

I DENY Mr. Robb's motion for summary judgment as to liability on Count II (the FSAA claim) and DENY the Railway's motion for summary judgment on that count. I DENY as moot each party's motions to strike portions of the other's statement of material facts, except for Mr. Robb's previously granted motion to substitute and correct Paragraph 17 of the Railway's 12N(3)(b) statement.